UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LLOYD F. AUDETTE,<br><br>Plaintiff,<br><br>v.<br><br>UMASS CORRECTIONAL HEALTH, a Commonwealth Medical Program, and DEPARTMENT OF CORRECTIONS, Kathleen M. Dennehy, Commissioner,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION<br>)  NO. 05-10403-DPW<br>)<br>)<br>)<br>)<br>)<br>) |

## STATUS REPORT

NOW COMES the Plaintiff, Lloyd Audette ("Mr. Audette"), and hereby submits this Status Report pursuant to the Court's Procedural Order dated May 24, 2005.

### A.      BACKGROUND

On or about February 24, 2005, Mr. Audette, a pro se prisoner incarcerated at the Souza-Baranowski Correctional Center ("SBCC") in Shirley, Massachusetts, filed a Complaint in the above-referenced matter.  On or about May 2, 2005, Mr. Audette filed a Motion to Amend the Complaint and the Pleadings, a renewed Motion for Temporary Restraining Order, and a Motion to Appoint Counsel, among others.  This Court appointed Bingham McCutchen LLP as counsel for Mr. Audette on or about Monday, May 9, 2005.  Bingham McCutchen, with the assistance of Howard Libman, M.D. ("Dr. Libman"), conducted an assessment of Mr. Audette's medical condition, including a review of medical records produced by the UMass Correctional Health Program ("UMass Correctional Health") in June 2005.

### B.      PROCEDURAL HISTORY

The parties were before the Court on May 24, 2005 for a Status Conference.  At that time, Mr. Audette's Motion for Temporary Restraining Order and Preliminary Injunction were withdrawn, and Plaintiff's Motion to Amend the Complaint was denied subject to refiling with

the Court . The Court ordered that amendments and a status report be filed by June 30, 2005, which was subsequently extended until July 7, 2005. This Status Report is submitted pursuant to the Court's May 24, 2005 Order, as modified.

### C.    MR. AUDETTE'S MEDICAL STATUS

UMass Correctional Health has suspended Mr. Audette's treatment for hepatitis C ("HCV"), and has removed the antiretroviral drug ddI (also referred to as "Videx") from Mr. Audette's treatment regimen for human immunodeficiency virus ("HIV"). Mr. Audette did not receive treatment for neuropathy, a chronic pain condition, from on or about April 12, 2005 until on or after June 7, 2005, but was eventually prescribed Ultram for pain relief. On or about July 1, 2005, Mr. Audette was informed by UMass Correctional Health medical personnel that he no longer would receive Ultram, and that he would not receive any other pain medication.

### D.    CONCLUSION/LITIGATION SCHEDULE

In his June 29, 2005 Assented to Motion to Extend Time to File Amended Complaint and Status Report, Mr. Audette indicated that his counsel required an additional week to "finaliz[e] their initial investigation into this matter" so as to "determine what claims will be asserted in the Amended Complaint." Counsel for Mr. Audette have completed their initial investigation, and have identified additional parties to be named and claims to be asserted in the First Amended Complaint. Counsel for Mr. Audette have prepared a First Amended Complaint and anticipate service of the First Amended Complaint on proposed new parties in accordance with Local Rule 15.1(b) no later than July 8, 2005. A copy of the proposed First Amended Complaint is attached as Exhibit A. Once service of the First Amended Complaint has been perfected, and with leave of this Court, counsel for Mr. Audette will file a Motion to Amend, with an anticipated filing date of July 18, 2005.

- 2 -

Respectfully submitted,

/s/ Brandon L. Bigelow
Donald J. Savery, BBO #564975
Rheba Rutkowski, BBO #632799
Brandon L. Bigelow, BBO #651143
T. Peter R. Pound, BBO #657378
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
(617) 951-8000

Dated: July 7, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon counsel of record for each other party via first class mail and the CM/ECF system on July 7, 2005.

/s/ Brandon L. Bigelow
Brandon L. Bigelow

# DRAFT

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LLOYD F. AUDETTE, <br><br> Plaintiff, <br><br> v. <br><br> UMASS CORRECTIONAL HEALTH PROGRAM, a program of the UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL; KATHLEEN M. DENNEHY, Commissioner of Correction; LOIS RUSSO, Superintendant of Souza-Baranowski Correctional Center, and her predecessors and successors; AUGUSTIN ENAW, M.D.; LORRAINE HAZARD, M.D.; and CHARLIE BLACK, <br><br> Defendants. | CIVIL ACTION NO. 05-10403-DPW |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

### Introduction

This is a civil action to redress the deprivation by Defendants of rights secured to Plaintiff, Lloyd F. Audette, by the Constitutions and laws of the United States and the Commonwealth of Massachusetts, as well as for tortious conduct that resulted in serious physical harm and emotional distress to Mr. Audette, an inmate at the Souza-Baranowski Correctional Center in Shirley, Massachusetts. Defendants, Kathleen M. Dennehy, Lois Russo, Augustin Enaw, M.D., Lorraine Hazard, M.D., and Charlie Black, have demonstrated deliberate indifference to Mr. Audette's serious medical needs, and failed to provide reasonable accommodations for his acknowledged physical disability. When Mr. Audette complained of his mistreatment, the Defendants retaliated by denying him pain medication.

This conduct violated the First, Eighth, and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983; Articles 1, 10, 11, 12, and 114 of the Declaration of Rights of the Constitution of the Commonwealth of Massachusetts and Mass. Gen. Laws ch. 12.

# DRAFT

§ 11I; and the Americans with Disabilities Act, 42 U.S.C. §§ 12132 et seq. Moreover, the action and inaction of all Defendants was negligent and either intentionally or negligently caused Mr. Audette to suffer emotional distress. Mr. Audette seeks prospective injunctive relief, compensatory and punitive damages, and attorneys' fees and costs, as authorized by 42 U.S.C. § 1988.

## Parties

1.     Plaintiff, Lloyd F. Audette ("Mr. Audette"), is currently incarcerated at the Souza-Baranowski Correctional Center in Shirley, Massachusetts ("SBCC"), a penal institution operation by the Massachusetts Department of Correction ("DOC").

2.     Defendant, UMass Correction Health Program ("UMass Correctional Health"), is a program of the University of Massachusetts Medical School ("UMMS"), with a principal place of business in Westborough, Massachusetts. Since January 1, 2003, UMass Correctional Health has provided medical services to inmates in the custody of the DOC pursuant to an agreement between UMMS and the DOC.

3.     Defendant, Kathleen M. Dennehy, is presently Commissioner of Correction for the Commonwealth of Massachusetts, and at all times relevant to this Amended Complaint, was acting within the scope of her employment in her capacity as Commissioner of Correction. She is directly responsible for the appointment, supervision, and training of DOC employees, and is responsible for ensuring that prisons in Massachusetts are operated and administered in accordance with federal and state law. She is responsible for the promulgation of all policies, rules, and regulations for the prison system, including medical care for prisoners, disciplinary rules, and sanctions imposed.

4.     Defendant, Lois Russo, is presently Superintendent of the SBCC, and at all times relevant to this Amended Complaint, was acting within the scope of her employment in her capacity as Superintendent. She is directly responsible for the management and operation of the SBCC, including responsibility for the care, custody and treatment of all SBCC prisoners; for the

# DRAFT

enforcement of rules and regulations promulgated by the Commissioner of Correction; and for ensuring the institution is managed and operated in accordance with federal and state law.

5.  Defendant, Augustin Enaw, M.D. ("Dr. Enaw"), is a medical doctor employed by UMass Correctional Health.  At all times relevant to this Amended Complaint, Dr. Enaw was acting within the scope of his employment with UMass Correctional Health.  Dr. Enaw provides medical care to inmates at the SBCC.

6.  Defendant, Lorraine Hazard, M.D. ("Dr. Hazard"), is a medical doctor employed by UMass Correctional Health.  At all times relevant to this Amended Complaint, Dr. Hazard was acting within the scope of her employment with UMass Correctional Health.  Dr. Hazard provides medical care to inmates at the SBCC.

7.  Defendant, Charlie Black ("Mr. Black"), is a Health Services Administrator at the SBCC and is employed by UMass Correctional Health, and at all times relevant to this Amended Complaint, was acting within the scope of his employment in his capacity as a Health Services Administrator for UMass Correctional Health.

## Jurisdiction and Venue

8.  The Court has subject matter jurisdiction over Mr. Audette's claims pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction), 1343 (civil rights jurisdiction), and 1367 (supplemental jurisdiction).

9.  Venue is proper pursuant to 28 U.S.C. § 1391(b).

## Factual Allegations

10.  In October 2001, Mr. Audette became a patient in the DOC healthcare system. As of January 1, 2003, the DOC contracted with UMMS through UMass Correctional Health to provide medical services at DOC facilities, including the SBCC.

11.  At the time he became a patient in the DOC healthcare system, Mr. Audette was infected with and receiving treatment for, among other things, human immunodeficiency virus (HIV).  Mr. Audette was diagnosed as HIV-positive in the late 1980s, and has been receiving

- 3 -

# DRAFT

treatment for that condition ever since.  At the time he became a patient in the DOC healthcare system, Mr. Audette had been diagnosed as being infected with the hepatitis C virus (HCV).

12.    On or about January 3, 2005, Dr. Enaw ordered that Mr. Audette begin treatment for his HCV condition the following week.  Dr. Enaw prescribed a combination therapy of pegylated interferon ("Peg-Intron") and Ribavirin (together, "HCV combination therapy") for Mr. Audette in connection with that treatment.

13.    At the time Dr. Enaw issued this order, Mr. Audette had already been receiving a combination of medications to suppress the viral load of HIV in his body.  These medications included ddI (also referred to as "Videx"), 3TC (also referred to as "Epivir"), and EFV (also referred to as "Sustiva").  The combination of these drugs sometimes is referred to colloquially as an "anti-HIV cocktail."

14.    At the time Dr. Enaw ordered that Mr. Audette receive HCV combination therapy together with his anti-HIV cocktail, it was recognized in the medical community that the antiretroviral drug ddI should not be coadministered with the anti-HCV drug Ribavirin because of an increased risk of severe lactic acidosis, peripheral neuropathy, and pancreatitis.

15.    Peripheral neuropathy refers to a variety of painful nerve conditions that result from nerve damage.  Lactic acidosis, an excess of lactic acid in the blood, can cause significant weight loss, as well as cellular damage.

16.    As ordered by Dr. Enaw, on or about January 10, 2005, Mr. Audette began HCV combination therapy, including administration of the anti-HCV drug Ribavirin.  At the same time, Mr. Audette continued to receive the antiretroviral drug ddI as part of his anti-HIV cocktail.

17.    At the time Mr. Audette began receiving HCV combination therapy, he weighed 160 pounds.  By February 14, 2005, Mr. Audette had lost approximately ten pounds, and he became concerned that his weight loss may be symptomatic of the onset of AIDS Wasting Syndrome.  Mr. Audette also feared that his weight loss would interfere with his ability to fight off infections.

LITDOCS/606981.4

# DRAFT

18.     In February 2005, Mr. Audette requested that his weight loss be addressed by UMass Correctional Health staff.  He noted that he had reported to the SBCC in February 2004 weighing 178 pounds.

19.     After orthopedic surgery in August 2004, Mr. Audette's weight dropped, and by October 2004 he weighed 164 pounds.  His weight loss appeared to have stabilized around 160 pounds in January 2005, but after beginning HCV combination therapy, Mr. Audette's weight again began to drop.

20.     By March 28, 2005, a registered nurse at the SBCC noted that Mr. Audette's weight had dropped from 160 pounds in January 2005 to only 142 pounds in late March 2005. Mr. Audette was given extra snacks and a dietary supplement in an unsuccessful effort to stabilize his weight loss, but UMass Correctional Health medical staff undertook no efforts to determine why Mr. Audette was experiencing such a precipitous weight decline.

21.     On or about April 16, 2005, Mr. Audette reported that he was losing vision in his right eye.  He was not seen by a member of the UMass Correctional health staff until two days later, on April 18, 2005.

22.     On April 18, 2005, Mr. Audette was seen by a registered nurse at the SBCC.  The nurse reported Mr. Audette's complaint to a medical doctor, who stated that Mr. Audette's condition was a medical emergency.

23.     The medical doctor immediately suspended Mr. Audette's HCV combination therapy, and directed that Mr. Audette be referred to the on-call doctor.  The on-call doctor confirmed that Mr. Audette should not receive any further HCV combination therapy, and suggested that Mr. Audette be scheduled for an appointment to see a doctor the following day.

24.     On April 19, 2005, UMass Correctional Health referred Mr. Audette to the Lemuel Shattuck Hospital in Boston, where he was examined by a member of staff in the eye clinic.  The member of staff told Mr. Audette that he could have a detached retina caused by HCV combination therapy.

- 5 -

# DRAFT

25.    On April 21, 2005, UMass Correctional Health referred Mr. Audette to the New England Medical Center, where his eye condition was again examined.  An examination by Rubin W. Kim, M.D. ("Dr. Kim"), a member of the New England Medical Center staff, indicated that Mr. Audette had suffered a detached retina in his right eye, and showed symptoms of recent damage to his left eye as well.  Dr. Kim also concurred with the decision to suspend HCV combination therapy.

26.    On May 16, 2005, Howard Libman, M.D. ("Dr. Libman"), a doctor retained by court-appointed counsel to assess Mr. Audette's medical condition, noted in a report submitted to the Court that the antiretroviral drug ddI and the anti-HCV drug Ribavirin should not be coadministered because of the increased risk of, among other things, severe lactic acidosis.

27.    Dr. Enaw did not order that Mr. Audette's lactic acid levels be monitored, and UMass Correctional Health staff did not monitor Mr. Audette's lactic acid levels, while co-administering ddI and Ribavirin to Mr. Audette between January 2005 and April 2005.

28.    Only after Dr. Libman suggested that ddI and Ribavirin should not be co-administered did UMass Correctional Health test Mr. Audette for elevated lactic acid levels.  On May 24, 2005, the Lemuel Shattuck Hospital conducted tests for lactic acid levels in samples of Mr. Audette's blood collected on May 11, 2005 and May 20, 2005.

29.    The lactic acid level of Mr. Audette's blood sample on May 11, 2005 – almost one month after suspension of co-administration of ddI and Ribavirin – was 4.4 mmol/L.  The lactic acid of Mr. Audette's blood sample on May 20, 2005 was 3.0 mmol/L.  A normal level is approximately less than 2.1 mmol/L, according to standards used by the Lemuel Shattuck Hospital laboratory.

30.    Mr. Audette gained ten pounds within a short time after UMass Correctional Health personnel suspended co-administration of HCV combination therapy with the anti-HIV cocktail.  Mr. Audette's anti-HIV cocktail has since been altered to eliminate the antiretroviral drug ddI.

- 6 -

# DRAFT

31.     The co-administration of ddI and Ribavirin to Mr. Audette between January 2005 and April 2005 induced severe lactic acidosis in Mr. Audette and caused him significant physical harm, including dramatic weight loss, a known side effect of lactic acidosis, as well as emotional distress.

32.     At the time he became a patient in the DOC healthcare system, Mr. Audette also had a history of multiple traumatic injuries, and suffered serious pain when walking as a result of those injuries, despite a number of orthopedic surgeries.  At the time he became a patient of the DOC healthcare system, Mr. Audette wore "Rockport" brand walking shoes in order to alleviate the serious pain he experienced when he walked.

33.     While he was incarcerated at MCI-Norfolk from March 2003 to February 2004, Mr. Audette was permitted to wear his "Rockport" walking shoes.  Just prior to his transfer from MCI-Norfolk to the SBCC, however, Mr. Audette's shoes were confiscated, and Mr. Audette was forced to wear the standard shoes issued by the DOC.  These shoes did not alleviate the serious pain Mr. Audette experienced when he walked.

34.     In July 2004, Mr. Audette filed a grievance requesting that he be seen by an orthopedic surgeon concerning pain in his left knee.  He reported that he had previously been diagnosed with arthritis and debris "floating around in the knee," and that, while he had been scheduled twice for consultation with an orthopedic surgeon, he had not yet been seen.  At that time, Mr. Audette requested yet again that he be scheduled for a consultation with an orthopedic surgeon.

35.     In October 2004, Mr. Audette reported via a "sick slip" that his "left foot keeps locking and clicking, extreme pain, left knee keeps locking and clicking and grinding, right ankle keeps swelling . . . both hips keep locking."  Mr. Audette asked to see an orthopedic surgeon concerning these issues.

36.     In early December 2004, Mr. Audette complained that swelling and lumps in his feet were rubbing painfully against the standard-issue shoes issued by the DOC, and requested

LITDOCS/606981.4

# DRAFT

that he be issued orthopedic footwear.  On or about January 18, 2005, Mr. Audette was seen by a podiatrist pursuant to that request.

37.    The podiatrist diagnosed Mr. Audette with bone spurs in his left foot, and recommended that Mr. Audette be issued "Rockport" walking shoes to alleviate the pain that Mr. Audette experienced in his left foot associated with those bone spurs.

38.    On or about January 24, 2005, a nurse practitioner at the SBCC issued a medical order for "Rockport" walking shoes to be issued by the SBCC canteen.

39.    On January 27, 2005, pursuant to the recommendation of the podiatrist and the January 24, 2005 medical order, Mr. Audette requested that the canteen issue "Rockport" walking shoes to him at no cost.

40.    Despite the recommendation by the podiatrist and the January 24, 2005 medical order, Mr. Black rejected Mr. Audette's request for "Rockport" walking shoes because, according to Mr. Black, the podiatrist had only recommended "Rockport" walking shoes, but had not ordered them.

41.    On or about February 8, 2005, Mr. Audette submitted a request for reasonable accommodation to the duty superintendent at the SBCC, noting that the pain he experienced in his left foot interfered with his ability to walk or to exercise.  Mr. Audette never received a response to this request.

42.    To date, Mr. Audette has not been provided "Rockport" walking shoes by UMass Correctional Health or the DOC, despite the fact that those shoes were ordered by UMass Correctional Health personnel.  He continues to suffer significant pain in his left foot, which interferes with his ability to walk or use the exercise facilities at the SBCC.

43.    Concerned about his serious medical health issues, and believing that the DOC and UMass Correctional Health staff were deliberately indifferent to his serious medical needs and were discriminating against him on the basis of his disability, Mr. Audette filed the above-captioned action in the United States District Court for the District of Massachusetts on or about February 16, 2005.

- 8 -

# DRAFT

44.    Mr. Audette continued to express concern about his weight loss between February and March 2005, and became increasingly concerned that he was suffering the onset of AIDS Wasting Syndrome, a condition characterized by dramatic weight loss. Throughout this period, Mr. Audette suffered severe emotional distress related to his poor medical condition.

45.    In March 2005, Mr. Audette reported that the pain medication he was receiving, methadose, a narcotic drug, was not effective in alleviating the pain he suffered from neuropathy. He shared articles he had read with UMass Correction Health medical staff that indicated that the effect of methadose may be reduced when co-administered with Sustiva, as well as articles that suggested that methadose may reduce the efficacy of ddI.

46.    On March 31, 2005, although he had not requested an appointment with her, Mr. Audette was scheduled to see Dr. Hazard. Immediately before his appointment that day, Mr. Audette saw Dr. Hazard speak to Mr. Black.

47.    Dr. Hazard informed Mr. Audette that she was taking him off all pain medication. She ordered that Mr. Audette be tapered off methadose over a two-week period to minimize the effect of withdrawal from a narcotic drug and prescribed Voltaren, an anti-inflammatory drug, for pain. She informed Mr. Audette that after two weeks, he would be taken off of all pain medication.

48.    Mr. Audette told Dr. Hazard that he believed that the decision to deny him any remedy for pain medication was retaliation for his recently filed lawsuit. Dr. Hazard did not deny this allegation, but rather told Mr. Audette that she was taking him off of all pain management medication because Mr. Audette could not take narcotic medication while receiving antiviral drugs. Dr. Hazard did not discuss any non-narcotic alternatives for pain management with Mr. Audette on March 31, 2005.

49.    Mr. Audette was not tapered off methadose over a two-week period, but instead, received progressively reduced amounts of methadose for only approximately four days before his methadose treatment was suspended entirely.

# DRAFT

50.    On April 12, 2005, Mr. Audette saw Dr. Hazard once again.  Mr. Audette reported that the Voltaren made him nauseous, and told Dr. Hazard that he thought the end of his life was approaching because of his dramatic weight loss and his general feeling of poor health.

51.    Dr. Hazard acknowledged Mr. Audette's complaints, and told Mr. Audette that she would discontinue the Voltaren immediately.  Dr. Hazard did not offer any alternative pain treatment for Mr. Audette, although she knew that Mr. Audette suffered from neuropathy.

52.    Mr. Audette received no medication for pain management after approximately April 12, 2005 until on or after June 7, 2005, purportedly because, according to UMass Correctional Health personnel, he had not requested it.

53.    In early June 2005, Mr. Audette submitted a request for pain medication after learning that UMass Correctional Health took the position that he had not requested pain-management therapy, and was placed on a pain medication called Ultram.

54.    On or about June 29, 2005, counsel for Mr. Audette requested that DOC personnel hand-deliver a draft of this Amended Complaint to Mr. Audette, because security restrictions in the SBCC Special Management Unit, where Mr. Audette was then located, prevented counsel from delivering those papers directly to Mr. Audette.

55.    The draft of the Amended Complaint was not delivered to Mr. Audette until two or three hours later.  Two days later, Mr. Audette was informed by UMass Correctional Health medical staff that he would no longer be receiving pain medication.

## COUNT I
### (Deliberate Indifference and Civil Conspiracy in Violation of Federal Constitutional Rights – Against Defendants Enaw, Hazard, and Black)

56.    Mr. Audette incorporates each of the allegations of foregoing paragraphs as if fully set forth herein.

57.    The actions and inactions of Dr. Enaw, Dr. Hazard, and Mr. Black demonstrate deliberate indifference to the serious medical needs of Mr. Audette, and constitute cruel or unusual punishment that unlawfully deprives Mr. Audette of the rights guaranteed to him by the Eighth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

- 10 -

# DRAFT

58.    The Defendants acted and failed to act jointly and in concert with each other and with others, constituting civil conspiracy to violate rights, privileges, and immunities secured to Mr. Audette by the First, Eighth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

59.    As alleged above, Mr. Audette has suffered injuries as a result of the Defendants' acts and failures to act, for which the Defendants are liable in their individual capacities under the provisions of 42 U.S.C. § 1983 in an amount to be proven at trial.

### COUNT II
### (Retaliation and Civil Conspiracy in Violation of Federal Constitutional Rights – Against Defendants Hazard and Black)

60.    Mr. Audette incorporates each of the allegations of foregoing paragraphs as if fully set forth herein.

61.    The subsequent actions and inactions of Mr. Black and Dr. Hazard through the deprivation of pain medication to Mr. Audette in retaliation for exercising his right to seek redress in court for his injuries violates rights, privileges, and immunities secured to Mr. Audette by the First, Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

62.    The Defendants acted and failed to act jointly and in concert with each other and with others, constituting civil conspiracy to violate rights, privileges, and immunities secured to Mr. Audette by the First, Eighth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

63.    As alleged above, Mr. Audette has suffered injuries as a result of the Defendants' acts and failures to act, for which the Defendants are liable in their individual capacities under the provisions of 42 U.S.C. § 1983 in an amount to be proven at trial.

LITDOCS/606981.4

# DRAFT

<u>COUNT III</u>
**(Violation of State Constitutional Rights and Civil Conspiracy –
Against Defendants Enaw, Hazard, and Black)**

64.     Mr. Audette incorporates each of the allegations of foregoing paragraphs as if fully set forth herein.

65.     The Defendants' actions as set forth above constitute threats, intimidation, coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by Mr. Audette of rights secured to him by the Constitution and laws of the Commonwealth, including Articles 1, 10, 11, and 12 of the Massachusetts Declaration of Rights, and Mass. Gen. Laws ch. 12, § 11I.

66.     The Defendants acted jointly and in concert with each other and with others, constituting civil conspiracy to violate these laws.

67.     As alleged above, Mr. Audette has suffered injuries as a result of the Defendants' actions, for which the Defendants are liable to Mr. Audette under Mass. Gen. Laws ch. 12, § 11I in an amount to be proven at trial.

<u>COUNT IV</u>
**(Violation of Federal and State Constitutional Rights for Failure to Train and Supervise –
Against Defendants Dennehy and Russo, in their individual capacities as to claims for
monetary relief, and in their official capacities as to claims for prospective injunctive relief)**

68.     Mr. Audette incorporates each of the allegations of foregoing paragraphs as if fully set forth herein.

69.     Defendants Dennehy and Russo were and are responsible for the training and supervision of correctional officers and other personnel at the SBCC, and were and are obligated by law to ensure that Mr. Audette, while in custody at the SBCC, was and is treated in a manner consistent with the Constitution and laws of the United States and the Commonwealth of Massachusetts.

70.     The Defendants' acts and omissions as set forth above constitute deliberate indifference to Mr. Audette's constitutional rights and to a substantial risk of serious harm to Mr.

LITDOCS/606981.4

# DRAFT

Audette and retaliation in violation of rights secured to him by the First, Eighth, and Fourteenth Amendments to the United States Constitution; 42 U.S.C. § 1983; and Articles 1, 10, 11, and 12 of the Massachusetts Declaration of Rights.

71.     The Defendants' acts and failures to act also violate Mass. Gen. Laws ch. 124, § l; Mass. Gen. Laws ch. 125, § 12 and Mass. Gen. Laws ch. 127, § 32.

72.     As alleged above, Mr. Audette has suffered injuries as a result of the Defendants' acts and omissions, for which the Defendants are liable in their individual capacities under the provisions of 42 U.S.C. § 1983 in an amount to be proven at trial.

73.     As alleged above, the injuries suffered by Mr. Audette as a result of the Defendants' acts and failures to act are of a continuing nature, and for which there is no adequate remedy at law.  Accordingly, the Defendants in their official capacities should be ordered to ensure that Mr. Audette is properly administered treatment for pain associated with neuropathy, and that Mr. Audette is treated by medical personnel other than Dr. Enaw or Dr. Hazard.

## <u>COUNT V</u>
### (Violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12132 et seq. – Against All Defendants)

74.     Mr. Audette incorporates each of the allegations of foregoing paragraphs as if fully set forth herein.

75.     Mr. Audette is an individual with a disability as defined by the Americans with Disabilities Act.

76.     Defendants have discriminated against Mr. Audette by failing to provide reasonable accommodation for Mr. Audette's disabilities so that Mr. Audette may enjoy the benefits of services, programs and activities available to the general inmate population.

77.     Defendants have discriminated against Mr. Audette on the basis of his disabilities by treating him in a manner disparate to that of other similarly classified inmates.

78.     Defendants' actions deprive Mr. Audette of his right to be free from discrimination on the basis of disability as guaranteed by Article 114 of the Massachusetts Constitution and the Americans with Disabilities Act, 42 U.S.C. § 12132 et seq.

LITDOCS/606981.4

# DRAFT

79. As alleged above, the injuries suffered by Mr. Audette as a result of the Defendants' acts and failures to act are of a continuing nature, and for which there is no adequate remedy at law. Accordingly, the Defendants should be ordered to comply with the recommendation and order by medical personnel at SBCC and issue Mr. Audette orthopedic footwear. In addition, the Defendants are liable to Mr. Audette for compensatory damages, in an amount to be proven at trial, as well as attorneys' fees and costs.

**COUNT VI**
**(Negligence –**
**Against All Defendants)**

80. Mr. Audette incorporates each of the allegations of foregoing paragraphs as if fully set forth herein.

81. As providers of medical care at the SBCC, UMass Correctional Health and Dr. Enaw had a duty to provide adequate medical care to Mr. Audette, an inmate under their care.

82. As alleged above, Defendants UMass Correctional Health, Dr. Enaw, and Dr. Hazard breached their duty of care to Mr. Audette. Defendants UMass Correctional Health, Dennehy, Russo, and Mr. Black also breached their duty to provide adequate medical care to Mr. Audette.

83. As a direct and proximate result of the negligence of the Defendants, Mr. Audette suffered serious physical harm and emotional distress.

**COUNT VII**
**(Intentional Infliction of Emotional Distress –**
**Against All Defendants)**

84. Mr. Audette incorporates each of the allegations of foregoing paragraphs as if fully set forth herein.

85. As alleged above, the Defendants intended to inflict emotional distress upon Mr. Audette, or knew or should have known that such emotional distress was a likely result of their conduct.

LITDOCS/606981.4

# DRAFT

86.     The Defendants' conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community.

87.     The Defendants' misconduct caused Mr. Audette severe emotional distress of such a nature that no reasonable person could be expected to endure it.

88.     As a direct and proximate result of the Defendants' misconduct, as alleged above, Mr. Audette has suffered and continues to suffer severe emotional distress, mental suffering, and damages, in an amount to be proven at trial.

### COUNT VIII
### (Negligent Infliction of Emotional Distress –
### Against All Defendants)

89.     Mr. Audette incorporates each of the allegations of foregoing paragraphs as if fully set forth herein.

90.     As alleged above, the Defendants' conduct was negligent and was the direct and proximate cause of severe emotional distress suffered by Mr. Audette.

91.     The Defendants knew or should have known that their conduct would have caused Mr. Audette emotional distress, which has resulted in physical harm to him.

92.     In view of the Defendants' conduct, as alleged above, a reasonable person would have suffered emotional distress under such circumstances.

93.     As a direct and proximate result of the Defendants' negligent conduct, Mr. Audette has suffered and continues to suffer severe emotional distress, mental suffering, physical harm, and damages, in an amount to be proven at trial.

### REQUEST FOR RELIEF

Wherefore, the Plaintiff respectfully requests that this Court:

a)      Issue a permanent injunction enjoining the Defendants from further violations of the Plaintiff's civil rights;

b)      Issue an order requiring the Commissioner of Corrections to ensure that Plaintiff receives adequate medical treatment for HIV, HCV, and pain management;

- 15 -

# DRAFT

c)    Issue an order requiring the Commissioner of Corrections to ensure that Plaintiff receives the orthopedic footwear that was specifically ordered for him;

d)    Award Plaintiff compensatory damages for physical and emotional injury and for violation of Plaintiff's rights;

e)    Award Plaintiff punitive damages from each and every Defendant in their individual capacities;

f)    Award Plaintiff reasonable costs and attorneys' fees; and

g)    Grant Plaintiff all other relief as this Court may deem just and equitable.


**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.**


Respectfully submitted,

**LLOYD F. AUDETTE,**

By his attorneys,


/s/ Brandon L. Bigelow
Donald J. Savery, BBO #564975
Rheba Rutkowski, BBO #632799
Brandon L. Bigelow, BBO #651143
T. Peter R. Pound, BBO #657378
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
(617) 951-8000

Dated: July 8, 2005

- 16 -

# DRAFT

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon counsel of record for each other party via first class mail on July 8, 2005.

/s/ Brandon L. Bigelow
Brandon L. Bigelow

LITDOCS/606981.4