UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LLOYD F. AUDETTE,<br>　　　Plaintiff,<br><br>VS.<br><br>UMASS CORRECTIONAL HEALTH,<br>　　A Commonwealth Medicine Program,<br>　　　　Defendant, and<br><br>DEPARTMENT OF CORRECTION<br>　　Kathleen M. Denney, Commissioner,<br>　　　　Defendant. | CIVIL ACTION NO. 05-10403-DPW |

**OPPOSITION OF PROPOSED DEFENDANTS, PHILIP TAVARES, M.D.,
ANGELA D'ANTONIO, N.P., AND MARK SCHNABEL, N.P.,
TO PLAINTIFF'S MOTION TO AMEND THE COMPLAINT**

Now come the medical defendants, Philip Tavares, M.D., Angela D'Antonio, N.P., and

Mark Schnabel, N.P. (hereinafter referred to as the "proposed defendants"), and hereby oppose

the plaintiff's Motion to Amend the Complaint.  As grounds for this opposition, the proposed

defendants state as follows:

**PROCEDURAL HISTORY**

1.　　This is a civil action in which the plaintiff, a prisoner at the Souza-Baranowski

　　　Correctional Center, alleges claims of medical malpractice and civil rights violations

　　　against the defendants, UMass Correctional Health ("UMCH"), Charles Black, and

　　　Augustin Enaw, M.D.

2.　　The original Complaint, which was filed on February 24, 2005, was brought by

　　　Mr. Audette as a *pro se* plaintiff.  *See United States District Court ("USDC") Docket,*

　　　*Paper Entry #5.*

3.      The Complaint alleged that the defendants failed to treat Mr. Audette's neuropathy pain with adequate medication, failed to provide him with Rockport walking shoes from the Department of Correction ("DOC") canteen and failed to treat his Hepatitis C and weight loss. *See Plaintiff's Original Complaint, ¶¶14-16, 18.* The Complaint alleges that these failures amounted to medical malpractice and deliberate indifference to his serious medical needs, in violation of Mr. Audette's civil rights and the Americans With Disabilities Act. *See Plaintiff's Original Complaint, ¶1.*

4.      In May 2005, Mr. Audette moved to amend the pleadings to include additional parties, and he moved for appointment of counsel. *USDC Docket, Paper Entries #21 and 24.*

5.      On May 9, 2005, Judge Woodlock allowed plaintiff's Motion to Appoint Counsel and appointed Attorney Brandon Bigelow, from Bingham McCutchen LLP, as counsel (*pro bono*) for Lloyd Audette. *USDC Docket, Paper Entry #27.*

6.      The following day, on May 10, 2005, Attorneys Brandon Bigelow, Donald Savery, Rheba Rutkowski and Peter Pound filed Notices of Appearance on behalf of the plaintiff. *USDC Docket, Paper Entries #28-31.*

7.      On May 24, 2005, Judge Woodlock denied plaintiff's previous Motion to Amend the Complaint without prejudice, noting that Mr. Audette could refile his motion within thirty (30) days. *USDC Docket.*

8.      After several extensions, plaintiff filed his Motion to Amend the Complaint with the Court on July 22, 2005. *USDC Docket, Paper Entry #39.*

9.      On August 18, 2005, counsel for the defendants moved to have this case transferred to Superior Court for purposes of holding a medical malpractice tribunal on plaintiff's negligence claims. *USDC Docket, Paper Entry #40.*

2

10.    Thereafter, on August 23, 2005, Judge Woodlock allowed plaintiff's Motion to Amend and defendants' Motion to Transfer. Judge Woodlock further ordered that all non-expert, non-doctor discovery be completed by March 31, 2006. *USDC Docket.*

11.    On August 25, 2005, Judge Woodlock issued an order referring this case to a medical malpractice tribunal. *USDC Docket, Paper Entry #45.*

12.    On August 26, 2005, plaintiff filed his First Amended Complaint with the Court. This Amended Complaint added Charles Black, Augustin Enaw, M.D., Lorraine Hazard, M.D. and UMass Correctional Health as defendants to this cause of action. *USDC Docket, Paper Entry #46.* The Amended Complaint also alleged that, in addition to failing to provide Mr. Audette with Rockport walking shoes, the defendants co-administered Ribavirin and ddI, causing plaintiff to suffer lactic acidosis and causing his weight loss. *See Plaintiff's Amended Complaint, ¶¶14-53.* Plaintiff's Amended Complaint reiterated the claim that the defendants failed to provide Mr. Audette with adequate pain management for his peripheral neuropathy. *See Plaintiff's Amended Complaint, ¶¶14-53.*

13.    Thereafter, on February 24, 2006, plaintiff deposed DOC defendant, Michael Rodriguez.

14.    On March 2, 2006, Judge Woodlock granted the parties until May 31, 2006 to complete discovery. *USDC Docket.* Also on this date, the medical malpractice tribunal issued findings in favor of defendant Lorraine Hazard, M.D., but against defendants UMass Correctional Health and Augustin Enaw, M.D. *USDC Docket, Paper Entry #56.*

15.    On March 3, 2006, the defendants served plaintiff with their Response to Plaintiff's Request for Production of Documents. Thereafter, on March 15, 2006, defendants served plaintiff with their Answers to Plaintiff's Interrogatories. *See Exhibit A attached, Defendants' Response to Plaintiff's Request for Production of Documents and*

3

*Defendants' Response to Plaintiff's Supplemental Request for Production of Documents (without attachments) and Defendants' Answers to Plaintiff's Interrogatories.*

16.    On April 25, 2006, Lorraine Hazard, M.D. was dismissed from this case by a Stipulation signed by all parties.  *USDC Docket, Paper Entry #57.*

17.    On May 10, 2006, Judge Woodlock granted the parties until August 31, 2006 to complete discovery.  *USDC Docket, Paper Entry #59.*

18.    Following this extension, six (6) additional depositions went forward, including the depositions of the following:  Mindy Bowen, R.N. on June 1, 2006; Mark Schnabel, N.P. on June 5, 2006; defendant Charles Black, R.N. on June 6, 2006; Philip Tavares, M.D. on June 27, 2006; Lorraine Hazard, M.D. on August 3, 2006; and defendant Augustin Enaw, M.D. on August 22, 2006.

19.    In addition to the above discovery, on June 22, 2006, the defendants provided plaintiff with several polices and procedures, along with updated medical records, as supplemental materials to their March 3, 2006 Response to Plaintiff's Request for Production of Documents.  Defendants then provided another supplemental production of documents to plaintiff on August 31, 2006.  *See Exhibit A, Defendants' Letters to Plaintiff's Counsel dated June 22, 2006 and August 31, 2006 (without enclosures).*

20.    On September 14, 2006, Judge Woodlock allowed an extension for discovery, and, as of this date, all fact discovery was scheduled to be completed by November 28, 2006.

21.    Since Judge Woodlock's extension, plaintiff has taken an additional four (4) depositions, completing a total of eleven (11) depositions that plaintiff has taken in 2006. The depositions in November 2006 include the following individuals:  David Stone, M.D. on November 9, 2006; Barbara McGovern, M.D. on November 14, 2006; Angela D'Antonio, N.P. on November 15, 2006; and Iona Bica, M.D. on November 15, 2006.

4

22.    It has now been five (5) months since plaintiff deposed Dr. Tavares and Mark Schnabel. Plaintiff seeks to amend his Complaint for a second time to add these proposed defendants.  In addition to adding Mr. Schnabel and Dr. Tavares, plaintiff also now seeks to add Angela D'Antonio.  *See Plaintiff's Motion to Amend the Complaint, ¶4.*

23.    The basis for plaintiff's Motion to Amend is that each of these proposed defendants was deliberately indifferent to plaintiff's pain management issues in April and May of 2005. Specifically, plaintiff alleges that the proposed defendants were present at the April 2005 pain management committee meeting, and that none of them took any steps in the month following the meeting to treat Mr. Audette's painful neuropathy.  *See Plaintiff's Motion to Amend the Complaint, ¶4; Plaintiff's Proposed Second Amended Complaint, ¶¶60-66.*

## STATEMENT OF RELEVANT FACTS

1.    As plaintiff's Motion to Amend focuses almost exclusively on the period of time from April through May 2005, the proposed defendants summarize the relevant facts and pain management care provided to Mr. Audette during these two (2) months.

2.    In April 2005, plaintiff Lloyd Audette was incarcerated at Souza-Baranowski Correctional Center ("SBCC").  *See Exhibit B attached, Plaintiff's Medical Records dated April 2005.*  Mr. Audette was incarcerated on the North Side of SBCC during this month.  *Exhibit B, Plaintiff's Medical Records; See Exhibit C attached, Deposition Testimony of Angela D'Antonio dated November 15, 2006, p. 69:13-24.*

3.    In April 2005, Angela D'Antonio was employed by UMCH as a nurse practitioner. Ms. D'Antonio provided medical care to inmates incarcerated on the South Side of SBCC at this time.  *Exhibit C, Deposition Testimony of Angela D'Antonio, pp. 69:13-70:2.*

4.    On April 7, 2005, Mr. Audette filed a sick call slip with the UMCH medical staff, complaining that he was experiencing methadone withdrawal and that he was having

difficulty sleeping. UMCH staff responded to plaintiff's sick call slip on April 11, 2005, and, on this date, plaintiff was scheduled to be seen by the nurse practitioner to discuss his methadone withdrawal. *Exhibit B, sick call slip dated April 7, 2005.*

5.    On April 12, 2005, Dr. Philip Tavares **renewed Mr. Audette's Tylenol order for 100 days**. *Exhibit B, physician's order.*

6.    Also on April 12, 2005, Mr. Audette was seen by Dr. Lorraine Hazard at a chronic care visit. During this visit, the plaintiff told Dr. Hazard that he was vomiting his Voltaren medication, which he had been taking for his pain management. Plaintiff told Dr. Hazard that he did not want to restart methadone or another narcotic for his pain. Mr. Audette also told Dr. Hazard that he thought he had the dwindles as a result of his HIV disease, and that he felt the "end" was approaching. *Exhibit B, progress note dated April 12, 2005.* In response to plaintiff's complaints, Dr. Hazard decreased his Voltaren prescription, recommended Trazodone 75 mg for 30 days and ordered Megace and a mental health referral. *Exhibit B, progress note; physician's order.*

7.    On April 14, 2005, Mark Schnabel, N.P. discontinued Mr. Audette's 75 mg Trazodone prescription and reordered a lower dose of 50 mg of Trazodone for the plaintiff for 14 days. *Exhibit B, physician's order.*

8.    On April 16, 2005, Mr. Audette filed a sick call slip complaining of obstructed vision in his right eye. *Exhibit B, sick call request form dated April 16, 2005.*

9.    On April 18, 2005, Mr. Audette was seen by the infectious disease case manager, Mindy Bowen, R.N., during which he complained of spotty vision in his right eye. Mr. Audette did not complain of neuropathic pain during this visit. Ms. Bowen contacted the LSH for direction on how to treat Mr. Audette's right eye. *Exhibit B, progress note by Mindy Bowen.* Ultimately, Mindy Bowen scheduled Mr. Audette for a meeting with the doctor

6

on the following day, April 19, 2005. *Exhibit B, progress notes by Mindy Bowen; physician's order by Mindy Bowen.*

10.    At approximately 10:00 a.m. on April 19, 2005, infectious disease HIV doctor, David Stone, M.D., met with Mr. Audette regarding his eye issue and recommended an ophthalmology consult as soon as possible for diagnosis purposes. *Exhibit B, progress note by infectious disease clinic, Dr. David Stone.* Mr. Audette did not complain to Dr. Stone of neuropathic pain during this appointment.

11.    Mr. Audette was sent to the LSH eye clinic, where he was referred to be seen for a retinal evaluation at New England Medical Center ("NEMC"). *Exhibit B, LSH clinic visit – follow-up consultation.* At no point during his visit with the LSH ophthalmologist did Mr. Audette complain of neuropathic pain or pain management.

12.    Also on April 19, 2005, Angela D'Antonio formally responded to Mr. Audette's April 16th sick call slip, noting that plaintiff had already been sent out to the LSH for this issue. *Exhibit B, sick call request from dated April 16, 2005.* Ms. D'Antonio testified during her deposition that she would have responded to Mr. Audette's sick call request on this date, even though plaintiff was not housed on her side of the prison, because fellow nurse practitioner, Mark Schnabel, was not working at SBCC that day. *Exhibit C, Deposition Testimony of Angela D'Antonio, p. 106:8-18.*

13.    On April 21, 2005, plaintiff's eye was evaluated by retinal specialist, Dr. Rubin Kim, at NEMC. Dr. Kim concluded that Mr. Audette had central serous chorioretinopathy. *NEMC letter from Dr. Kim to Dr. Tavares.* Mr. Audette did not complain of neuropathic pain during this visit with Dr. Kim.

14.    On April 27, 2005, Angela D'Antonio recorded during the pain management committee ("PMC") meeting that, while Mr. Audette was on the list to be discussed at the meeting

that day, his case was referred to the next PMC meeting because the DOC pharmacist was unable to prepare his case due to technical difficulties in their department. *Exhibit B, progress note by Angela D'Antonio.*

15.    The DOC pharmacist would typically print out a list of the medications each inmate was taking prior to the PMC meeting.   On April 27, 2005, the computers at the pharmacy were not working, and the pharmacist was unable to print out Mr. Audette's medication list.   For this reason, the PMC did not have information regarding the medications Mr. Audette was taking in April 2005, and thus could not discuss him at the PMC meeting that day. *Exhibit C, Deposition Testimony of Angela D'Antonio, pp. 65:23-67:6, 107:12-108:15.*  As of this date, Mr. Audette was still taking Tylenol for his neuropathic pain, which had been prescribed for 100 days.

16.    On May 5, 2005, Mr. Audette filed a sick call slip inquiring about the results from his April eye appointment at NEMC, the pain management committee and his blood work. *Exhibit B, sick call request.*

17.    On May 9, 2005, Mindy Bowen responded to plaintiff's sick call slip, noting that Mr. Audette was scheduled for follow-up at NEMC's eye care center in one (1) month. Ms. Bowen forwarded the sick call slip to the nurse practitioner to address plaintiff's pain management concerns.

18.    On May 11, 2005, Mr. Audette was evaluated by co-infectious disease specialist, Dr. Barbara McGovern, at the LSH co-infection clinic.   *Exhibit B, LSH clinic visit follow-up consultation report by Dr. McGovern.*   Mr. Audette did not complain to Dr. McGovern about any neuropathic pain during this appointment.

19.    On May 20, 2005, Mr. Audette was re-evaluated by Dr. Stone at the LSH infectious disease clinic. *Exhibit B, LSH infectious disease consult report by Dr. David Stone.* Once again, Mr. Audette did not complain of neuropathic pain to Dr. Stone.

20.    Thereafter, on May 26, 2005, Mr. Audette's case was discussed at the PMC meeting. Angela D'Antonio recorded the medical note regarding the PMC's discussion. The note indicates that Mr. Audette had been taking Tylenol for his pain during May 2005. The PMC suggested that Mr. Audette begin taking Tramadol as an alternative drug to treat his pain management. *Exhibit B, progress note from May 26, 2005 PMC meeting.*

21.    Between the April 27, 2005 PMC meeting and the May 26, 2005 PMC meeting, Mr. Audette did not submit a single sick call slip in which he complained of neuropathic pain.

## ARGUMENT

### I.    MOTION TO AMEND STANDARD

When a pleading does not qualify for amendment as of course, a party may amend only by leave of court or by written consent of the adverse party. Fed.R.Civ.P. 15(a). While "leave [to amend] shall be freely given when justice so requires," "the liberal amendment policy prescribed by Rule 15(a) does not mean that leave will be granted in all cases." 6 Charles Alan Wright, et al., Federal Practice and Procedure, §1487 at 611 (2d ed. 1990); Judge v. City of Lowell, 160 F.3d 67, 79 (1st Cir. Mass. 1998). Denial of a motion to amend the complaint will be upheld so long as the record evinces an arguably adequate basis for the court's decision (e.g., futility, bad faith, undue delay, or a dilatory motive on the movant's part). Santiago-Marrero v. United States, 61 Fed. Appx. 718, 720 (1st Cir. P.R. 2003); Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d 12, 19 (1st Cir. 2001).

A.    <u>Plaintiff's Second Motion to Amend the Complaint to Add Ms. D'Antonio, Mr. Schnabel and Dr. Tavares as Defendants Should be Denied Because the Record Clearly Demonstrates That Such an Amendment Would be Futile.</u>

Where an amendment would be futile or would serve no legitimate purpose, the district court "should not needlessly prolong matters." <u>Correa-Martinez</u>, 903 F.2d 49, 59 (1st Cir. P.R. 1990); <u>see also</u> <u>Resolution Trust Corp. v. Gold</u>, 30 F.3d 251, 253 (1st Cir. 1994); <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962)(citing "repeated failure to cure deficiencies by amendments previously allowed" and "futility of amendment" as proper grounds for denial of leave to amend). "Futility" means that the complaint, as amended, would fail to state a claim upon which relief could be granted. <u>See</u> <u>3 Moore's Federal Practice</u> P 15.08[4] at 15-80 (2d ed. 1993); <u>see also</u> <u>Vargas v. McNamara</u>, 608 F.2d 15, 17 (1st Cir. 1979). If in their request for leave to amend plaintiffs allude to factual allegations which, if incorporated into an amended complaint would be destined for dismissal, it would be futile for the court to permit amendment of the complaint. <u>Maldonado v. Dominguez</u>, 137 F.3d 1, 11 (1st Cir. P.R. 1998).

The proposed defendants oppose the plaintiff's Motion to Amend on the grounds set forth in the <u>Maldonado</u> and <u>Vargas</u> cases. Specifically, plaintiff's new Eighth Amendment claims against Angela D'Antonio, N.P., Mark Schnabel, N.P. and Philip Tavares, M.D. are futile because the records in this case clearly demonstrate that these providers were not deliberately indifferent to Mr. Audette's serious medical needs. This Motion to Amend should be denied, as plaintiff's Amended Complaint fails to state a claim upon which relief can be granted.

1.    <u>Neither Ms. D'Antonio, Mr. Schnabel or Dr. Tavares Were Deliberately Indifferent to Mr. Audette's Serious Medical Needs in April 2005.</u>

It is clear that "[i]n order to establish that medical mistreatment constitutes a violation of the Eighth Amendment, a prisoner must show 'acts or omissions' sufficiently harmful to evidence deliberate indifference to serious medical needs." <u>Miranda v. Munoz</u>, 770 F.2d 255,

259 (1st Cir. 1985), quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976). In order to assert an Eighth Amendment claim, the plaintiff must satisfy a two-pronged standard. Farmer v. Brennan, 511 U.S. 825, 834 (1994); Torres v. Commissioner of Correction, 427 Mass. 611, 616 (1998). The first prong requires proof that the plaintiff was subjected to conditions which posed a substantial risk of serious harm. Under the second prong, the plaintiff must show acts or omissions which were sufficiently harmful to evidence deliberate indifference to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 106 (1976). See Watson v. Caton, 984 F.2d 637, 540 (1st Cir. 1993)(inmate must demonstrate that the denial of medical treatment was for the purpose of punishment or the result of "wanton" decisions to deny or delay treatment).

In the context of Section 1983 claims for infliction of cruel and unusual punishment, the federal courts have applied the standard enunciated in Estelle strictly and have defined "deliberate indifference" narrowly. See e.g., Ferranti v. Moran, 618 F.2d 888 (1st Cir. 1980); Layne v. Vinzant, 657 F.2d 468 (1st Cir. 1980). The Estelle standard requires a showing that plaintiff's "serious medical needs" are something more than negligent treatment. Specifically, in order to establish deliberate indifference, the plaintiff must prove that the defendant had a culpable state of mind and intended wantonly to inflict pain. DesRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991). Deliberate indifference manifests itself when a prison doctor intentionally denies or delays an inmate's access to medical care or intentionally interferes with treatment after it has been prescribed. Farmer v. Brennan, 511 U.S. 825, 835 (1994)("[d]eliberate indifference describes a state of mind more blameworthy than negligence").

Thus, in order for plaintiff to have a legitimate claim against Ms. D'Antonio, Mr. Schnabel and Dr. Tavares, Mr. Audette must be able to prove that these medical providers either intentionally interfered with his treatment as prescribed by another doctor, or that they had a culpable state of mind and intended to inflict pain on Mr. Audette when administering medical

care. Contrary to plaintiff's assertion that these individuals were deliberately indifferent to plaintiff's serious medical needs when failing to "take steps in the month after the [pain management] meeting to investigate or alleviate Mr. Audette's painful condition," the medical records in this case clearly demonstrate that neither Ms. D'Antonio, Mr. Schnabel or Dr. Tavares intended to cause plaintiff harm when treating his neuropathic pain, or that they ignored a serious risk to Mr. Audette's health in April or May 2005.

In late September/early October 2004, the PMC began meeting at SBCC in order to address the cases of several SBCC inmates who were taking narcotic medications. *Exhibit C, Deposition Testimony of Angela D'Antonio, pp. 39:6-40:13, 42:11-19.* These meetings typically took place on a monthly basis. *Exhibit C, Deposition Testimony of Angela D'Antonio, p. 46:7-17.* Attendance at the PMC meetings would vary upon availability, but could include the DOC pharmacist, Charles Gordon; the nurse practitioners, Mr. Schnabel and Ms. D'Antonio; the SBCC medical director, Philip Tavares, M.D.; and sometimes the SBCC staff physician, the SBCC director of nursing, the SBCC health services administrator and, on occasion, representatives from the DOC. *Exhibit C, Deposition Testimony of Angela D'Antonio, pp. 49:14-50:4.* Before each scheduled PMC meeting, Ms. D'Antonio and Mr. Schnabel would create a list of inmates whose cases were to be discussed at the meeting and would give that list to DOC pharmacist, Charles Gordon, who would generate a list of those inmates' current medications to be discussed at the meeting. *Exhibit C, Deposition Testimony of Angela D'Antonio, pp. 63:19-66:4.* During the PMC, the attendees would review each selected inmate's current medications to see whether they were effective, and then make recommendations regarding future pain management and medication control. *Exhibit C, Deposition Testimony of Angela D'Antonio, pp. 59:18-61:1.* If an inmate was on the PMC's list but was not discussed at

the meeting, he would be discussed at the next PMC meeting. *Exhibit C, Deposition Testimony of Angela D'Antonio, p. 66:12-18.*

Contrary to plaintiff's vague assertions in his Motion to Amend the Complaint, there is no evidence that Angela D'Antonio was deliberately indifferent to plaintiff's serious medical needs in April or May 2005. Angela D'Antonio testified during her deposition that she worked on the South Side of SBCC in April and May 2005, and not on the North Side, where Mr. Audette was housed. *Exhibit C, Deposition Testimony of Angela D'Antonio, p. 69:13-24.* Ms. D'Antonio never provided Mr. Audette with any direct treatment in April or May 2005 while he was housed on the North Side. Ms. D'Antonio only reviewed plaintiff's complaints in April and May 2005 when Mark Schnabel was not working at the facility – on two occasions. Ms. D'Antonio was only aware of Mr. Audette's case and condition in April and May 2005 based on her attendance at the PMC meetings. Ms. D'Antonio did not provide plaintiff with any direct treatment in April or May 2005, and there is no evidence in this case that Ms. D'Antonio played a significant role in managing Mr. Audette's pain or that she had any control over his pain management, and, thus, plaintiff will be unable to establish that she was deliberately indifferent to his serious medical needs.

As for plaintiff's new allegations against Mr. Schnabel and Dr. Tavares, the medical records in this case clearly indicate that Mr. Audette's case was not discussed at the April 2005 PMC meeting due to technical difficulties on the part of the **DOC pharmacy**. There is no evidence that either Mr. Schnabel or Dr. Tavares was responsible for the PMC's inability to discuss Mr. Audette's case on April 27th, nor that either of these individuals was even at the PMC meeting on April 27, 2005. Without any evidence that either Mr. Schnabel or Dr. Tavares attended the April PMC meeting, there is simply no evidence in this case that these individuals knew of Mr. Audette's issues with his neuropathic pain in late April and May 2005.

13

Moreover, this is not a case where Mr. Audette's need for pain management was ignored by either of these medical providers. Plaintiff's pain management case were not dismissed by the PMC in April 2005, but, rather, his case was rescheduled and was discussed at the following PMC meeting in May 2005. In the interim, Mr. Audette's pain was treated with Tylenol. Although the plaintiff has suggested during the course of discovery that Tylenol was an inappropriate pain medication to treat neuropathic pain, it is well-established that deliberate indifference is a far different standard than medical negligence. Farmer, 511 U.S. at 835. Moreover, Mr. Audette had no complaints of pain between April 27, 2005 and May 26, 2005, either through sick call slips or through verbal complaints during his numerous visits with both UMCH staff and outside providers. In fact, the record in this case clearly demonstrates that both Mr. Schnabel and Dr. Tavares provided plaintiff with continuous and immediate care with regard to all his medical issues in April and May 2005. *See Exhibit B.* As it was Mr. Audette who told Dr. Hazard in April 2005 that he did not wish to be restarted on methadone or other narcotics for his pain control, there is no evidence that either Mr. Schnabel or Dr. Tavares ignored plaintiff's need for pain medication or that Mr. Audette was ever at risk of harm while taking Tylenol in May 2005. *See Exhibit B, progress note dated April 12, 2005.*

Given the medical records and Angela D'Antonio's deposition testimony in this case, the record clearly indicates that neither Angela D'Antonio, N.P., Mark Schnabel, N.P. or Philip Tavares, M.D. was deliberately indifferent to Mr. Audette's serious medical needs in either April or May 2005. Because there is absolutely no evidence, aside from plaintiff's allegations, to prove that Ms. D'Antonio, Mr. Schnabel or Dr. Tavares intended to inflict pain on Mr. Audette or intentionally ignored his need for treatment when providing him with medical care in April or May 2005, plaintiff has no hope of proving his proposed Eighth Amendment claim against these

individuals, and the Motion to Amend the Complaint should be denied on the grounds that such a motion is futile.

> **B.**  **Denial of Plaintiff's Second Motion to Amend the Complaint to Add Ms. D'Antonio, Mr. Schnabel and Dr. Tavares as Defendants Is Appropriate Because the Amendment Is the Product of Undue Delay by the Plaintiff.**

In determining whether a plaintiff's undue delay in seeking to amend the complaint is attributable to the defendant's response to discovery, the inquiry is not limited to the defendant's conduct, but also involves what the plaintiff knew or should have known and what he did or should have done when considering whether justice requires leave to amend under the discretionary Fed.R.Civ.P. 15(a) provision.  Steir v. Girl Scouts of the USA, 383 F.3d 7, 14 (1st Cir. N.H. 2004).  "When considerable time has elapsed between the filing of the complaint and the motion to amend, the movant has the burden of showing some valid reason for his neglect and delay."  Acosta-Mestre v. Hilton Int'l, 156 F.3d 49, 52 (1st Cir. 1998)(quoting Stepanischen v. Merchs. Despatch Transp. Corp., 722 F.2d 922, 933 (1st Cir. 1983)(internal quotation marks omitted)).  When plaintiff takes up a strategy similar to the "'wait-and-see-what-happens' approach," this also constitutes undue delay.  In re Stone & Webster, Inc., Sec. Litig., 217 F.R.D. 96, 99 (D. Mass. 2003); In re Capstead Mortg. Corp. Secs. Litig., 258 F. Supp. 2d 533, 568 (N. D. Tex. 2003)("Such approach unnecessarily prolongs litigation and effectively awards [sic] Plaintiffs for the unjustified delay"); see also In re Digital Island Secs. Litig., 2002 WL 31667863, at *1 (D. Del. Nov. 25, 2002)("The court is troubled by the plaintiffs' decision to file this motion not only after the motion to dismiss had been filed, but *after* the court had decided this motion and dismissed their claims.")(emphasis in original); In re NAHC, Inc. Secs. Litig., 2001 WL 1241007 at *25 (E.D. Pa. Oct. 17, 2001)(after ten law firms had over a year to produce a consolidated complaint from six individual complaints, the court had "no doubt that the action is mature from a pleading perspective")(aff'd, 306 F.3d 1314 (3d Cir. 2002)); In re

Champion Enters., Inc. Secs. Litig., 145 F. Supp. 2d 871, 873 (E.D. Mich. 2001)(holding heightened pleading requirement of PSLRA "is meaningless if judges on a case-by-case basis grant leave to amend numerous times.").

In the instant case, plaintiff's original Complaint was filed on February 24, 2005, over nineteen (19) months ago, in which plaintiff alleged that the defendants were both deliberately indifferent to his serious medical needs and that they were negligent when providing him with medical care. *See Plaintiff's Original Complaint, ¶1.* Mr. Audette's Amended Complaint was filed with the Court on August 26, 2005, adding additional defendants and medical issues to his allegations. *See Plaintiff's Amended Complaint; See USDC Docket, Paper Entry #46.* Now, over a year after bringing suit and then amending the Complaint, Mr. Audette seeks to bring a cause of action for deliberate indifference against three (3) additional medical providers – Angela D'Antonio, N.P., Mark Schnabel, N.P. and Philip Tavares, M.D. *See Plaintiff's Motion to Amend Complaint, ¶4.*

Although the plaintiff premised his Motion for Leave to Amend on the theory that his claims against these individuals are the product of discovery conducted in a diligent manner, much of the information on which Mr. Audette bases his Amended Complaint was available to the plaintiff five (5) months ago, in June 2006. In March 2006, the defendants responded to plaintiff's Request for Production of Documents and provided plaintiff's counsel with a copy of Mr. Audette's medical records from April 2005. *See Exhibit A, Defendants' Response to Plaintiff's Request for Production of Documents and Defendants' Response to Plaintiff's Supplemental Request for Production of Documents (without attachments).* By June 27, 2006, plaintiff's counsel had completed the depositions of Mr. Schnabel and Dr. Tavares, in addition to having access to all of Mr. Audette's medical records from April and May 2005 – the time period which plaintiff claims is relevant to his addition of these defendants. *See Exhibit A.* Despite this

16

fact, the plaintiff chose to wait five (5) months before identifying these individuals, even after having knowledge of their involvement in plaintiff's medical care long before this Motion to Amend.

While plaintiff may rely on the fact that Angela D'Antonio was not deposed until November 15, 2006 as a basis for the delay in his Motion to Amend, this reliance is misplaced. On June 5, 2006, at his deposition, Mark Schnabel discussed Angela D'Antonio's limited role in Mr. Audette's care in April 2005. *See Exhibit D attached, Deposition Testimony of Mark Schnabel dated June 5, 2006, pp. 21:3-12, 159:3-160:10.* The medical records in this case further demonstrate that Ms. D'Antonio did not provide Mr. Audette with any direct care in April 2005, as she was working on the South Side of SBCC, whereas Mr. Audette was housed on the North Side of SBCC. *Exhibit D, Deposition Testimony of Mark Schnabel, pp. 21:3-12, 159:3-160:10; Exhibit C, Deposition Testimony of Angela D'Antonio, p. 69:13-24.* Ms. D'Antonio's only involvement in plaintiff's care was at the PMC meetings, and this participation only involved discussing plaintiff's case, not providing direct care to Mr. Audette. *Exhibit A, Defendants' Response to Plaintiff's Request for Document Production and Defendants' Response to Plaintiff's Supplemental Request for Production of Documents (without attachments); Exhibit D, Deposition Testimony of Mark Schnabel, pp. 21:3-13, 159:3-160:10.* Additionally, Angela D'Antonio's November deposition did not provide plaintiff with any new insight into the medical care provided to Mr. Audette in April or May 2005, given that plaintiff was already in possession of the relevant April and May 2005 medical records several months before this deposition. As such, plaintiff could easily have amended the Complaint to add Mark Schnabel and Dr. Tavares before Angela D'Antonio's deposition on November 15, 2006. To ignore facts for five (5) months that the plaintiff now characterizes as helpful or even crucial to

their case, all the while deposing other witnesses and requesting additional medical records, is precisely the sort of "undue delay" that should result in a denial of leave to amend.

Given that in June 2006 the plaintiff had knowledge of the same facts discussed during the depositions taking place in November 15th of this year, the plaintiff should not now be permitted to amend the Complaint to add new defendants when such an amendment is the product of undue delay.

**WHEREFORE**, for the foregoing reasons, the proposed defendants, Philip Tavares, M.D., Angela D'Antonio, N.P., and Mark Schnabel, N.P., respectfully request that the plaintiff's Motion to Amend the Complaint be denied.

|  |  |
|---|---|
| I hereby certify that on December 1, 2006, a true copy of the above document was served upon each counsel of record electronically through filing with the ECF system, and an additional copy of this document with the exhibits was served upon counsel by first class mail. | Respectfully Submitted,<br>The Proposed Defendants,<br>PHILIP TAVARES, M.D.,<br>ANGELA D'ANTONIO, N.P.<br>and MARK SCHNABEL, N.P.<br>By their attorneys, |
| /S/ Lisa R. Wichter | /S/ Lisa R. Wichter |
| _____ | _____ |
| Lisa R. Wichter | James A. Bello, BBO #633550<br>Lisa R. Wichter, BBO #661006<br>Morrison Mahoney LLP<br>250 Summer Street<br>Boston, MA 02210<br>(617) 439-7500 |