UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LLOYD F. AUDETTE,<br> Plaintiff,<br>v.<br><br>UMASS CORRECTIONAL HEALTH, a<br>program of the University of Massachusetts<br>Medical School; KATHLEEN M.<br>DENNEHY, Commissioner of Correction;<br>LOIS RUSSO, Superintendent of Souza-<br>Baranowski Correctional Center, and her<br>predecessors and successors; AUGUSTIN<br>ENAW, M.D.; LORRAINE HAZARD,<br>M.D.; and CHARLIE BLACK,<br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION
NO. 05-10403-DPW

**OPPOSITION OF PROPOSED DEFENDANTS, IOANA BICA, M.D. AND
DAVID R. STONE, M.D., TO PLAINTIFF'S MOTION TO AMEND
THE FIRST AMENDED COMPLAINT**

The proposed defendants, Ioana Bica, M.D. ("Dr. Bica") and David R. Stone, M.D. ("Dr. Stone"), hereby oppose plaintiff's motion for leave to amend his first amended complaint to add Dr. Bica and Dr. Stone as party defendants. As will be set forth more fully below, the plaintiff, who is clearly very knowledgeable about his medical care and his medical providers, has known or at the very least *should have known* about Dr. Bica's involvement in the care and treatment of his Hepatitis C (HCV), and Dr. Stone's involvement in the care and treatment of his HIV, by the time his attorneys were appointed to represent him on May 9, 2005, if not at the time he filed his original complaint on February 24, 2005. Plaintiff's attorneys, having met with their client and having obtained the plaintiff's medical records from UMass Correctional Health by early May, 2005, *should have known* about Dr. Stone's involvement in the care of plaintiff's HIV condition, and were at least on inquiry notice as to the existence of a physician involved with the plaintiff's HCV condition (even if they could not yet identify this physician as Dr. Bica), as of the time the

first amended complaint was prepared and filed in July, 2005. Notably, both the plaintiff and his attorneys have been aware of the factual predicate for the very claims he now seeks to bring against Dr. Bica and Dr. Stone since July 7, 2005, when a draft copy of plaintiff's first amended complaint was filed with the Court, setting forth allegations of medical malpractice arising between February and May, 2005 in connection with the co-administration of the HIV medication ddi (Videx) with the HCV medication Ribavirin. Plaintiff's investigation leading up to the assertion of these allegations should have revealed the identity of Dr. Stone, and at a minimum, alerted plaintiff to the fact that a physician at Lemuel Shattuck Hospital's co-infection clinic had recommended HCV treatment for the plaintiff on January 28, 2004. Moreover, plaintiff has been in possession of the Lemuel Shattuck Hospital records since at least November 4, 2005, and thus had had the ability since that time to definitively identify Dr. Bica as the physician who recommended HCV treatment for the plaintiff on January 28, 2004.

Yet, plaintiff has waited twenty-one months since filing his original complaint and over fifteen months since filing his first amended complaint to bring a motion to add Drs. Bica and Stone as additional defendants. To justify the delay in seeking amendment, the plaintiff disingenuously suggests that he was not aware of Dr. Bica's and Dr. Stone's involvement in the treatment of his HCV and HIV conditions until defendant Augustine Enaw, M.D. "unexpectedly" testified on August 22, 2006 that he relied on Dr. Bica's 1/28/04 recommendation to start HCV therapy when he (Dr. Enaw) ordered HCV therapy for the plaintiff on 1/3/05, and that he relied on Dr. Stone to manage the plaintiff's HIV. As set forth below, the plaintiff and his attorneys have been aware of the identity of these two physicians and their respective involvements in treating plaintiff's HCV and HIV conditions, at the very least, for over a year now. Pursuant to Local Rule 15.1(A), plaintiff was required to bring the present motion at that time. Without a doubt, allowance of plaintiff's motion to amend his first amended

complaint, now that the discovery deadline has passed and numerous witnesses have been deposed, will result in unfair prejudice to both Dr. Bica and Dr. Stone, and further delay the resolution of this case. For these reasons, this Court should deny plaintiff's motion to amend his first amended complaint.

## BRIEF FACTUAL HISTORY

Plaintiff, Lloyd Audette, is an inmate at Souza-Baranowski Correctional Center (SBCC). He has been an inmate at SBCC since approximately February of 2004. Prior to SBCC, plaintiff was an inmate at Norfolk Correctional Institution. Plaintiff is co-infected with HIV and Hepatitis C (HCV). The present litigation stems from the assertion by the plaintiff that the medication Ribavirin (administered in combination with Peg-Interferon to treat HCV) should not have been co-administered with the HIV medication ddi (Videx) from January 10, 2005 to April 18, 2005.

On January 28, 2004, Dr. Bica, then a physician in the co-infection clinic at Lemuel Shattuck Hospital, saw the plaintiff at Shattuck Hospital for a consult visit. (Dr. Bica had also treated the plaintiff prior to 1/28/04, see, e.g., Exhibit A). In her note of January 28, 2004 (Exhibit B), among other things, Dr. Bica wrote, "Would give trial of Peg-Interferon/Ribavirin. **Discussed extensively** side effects from depression, cytopenia, proteinuria, thyroiditis, headache, visual changes, coma, etc. Please ask for formal psychiatric evaluation in anticipation of Pegelated Interferon/Ribavirin. Please consult ophthalmology, baseline retina exam." Dr. Bica's note goes on to describe her suggested dosing, and the labs that should be done once therapy is initiated. Dr. Bica's note further suggests switching plaintiff's HIV medication Kaletra to Sustiva. Her note also requests that the plaintiff follow up in the co-infection clinic one month after starting HCV therapy. Dr. Bica's note is contained in the plaintiff's medical records from Lemuel Shattuck Hospital.

Plaintiff was transferred to SBCC sometime in February of 2004. Since plaintiff's arrival at SBCC, Dr. Stone, an infectious disease consultant at SBCC, has provided care and treatment for the plaintiff's HIV condition. Plaintiff's medical records from defendant UMass Correctional Health (UMCH) while an inmate at SBCC are replete with various requests from the plaintiff to see Dr. Stone in connection with his HIV medications (see e.g., Exhibit C).

On March 10, 2004, plaintiff signed out a "PEG-INTRON Access Form," which was then faxed to the UMass Correctional Health Program – part of the process for obtaining approval to begin the HCV therapy of Peg-Interferon and Ribavirin (Exhibit C).

On December 28, 2004, plaintiff was approved to begin HCV treatment. On January 3, 2005, Dr. Augustine Enaw, the Medical Director at SBCC, signed a Physician's Order that provided for plaintiff to begin HCV therapy consisting of Peg-Interferon and Ribavirin on January 10, 2005. Plaintiff began his HCV treatment on January 10, 2005. At that time, plaintiff was also receiving the medication ddi (Videx) for his HIV condition. The HCV treatment was stopped on April 18, 2005. Plaintiff met with Dr. Stone during the infectious disease clinics at SBCC on March 8, 2005, April 19, 2005, and May 29, 2005 (Exhibit C).

## RELEVANT BACKGROUND AND PROCEDURAL HISTORY

1.  On **February 24, 2005**, plaintiff, *pro se*, filed a verified complaint against UMass Correctional Health and Kathleen Dennehy, Commissioner of the Department of Corrections, alleging a deprivation of his rights under the Americans with Disabilities Act, the Rehabilitation Act of 1973, and the Eight Amendment of the United States Constitution. Plaintiff alleged, *inter alia*, that SBCC refused to provide him with Rockport walking shoes and adequate pain medication. Plaintiff further alleged that he was not receiving his HIV medications on time, and that he had lost approximately 40 pounds of body weight because he was not receiving testosterone and oxandrolone treatment.

    a.  In an Affidavit filed with his complaint that provided further detail as to nature of his grievances, plaintiff states: "**I had to wait over one year for Hep C treatment <u>although it was ordered</u> and I was symptomatic**." (Plaintiff's Affidavit, ¶ 18 at pg. 2) (emphasis added).

b. Along with his verified complaint and affidavit, plaintiff filed 24 pages comprising grievance forms, notes, letters, and medical records, all of which provide further detail about plaintiff's grievances as to issues with his Rockport shoes, pain medications, and HIV medications.

  i. As an example of plaintiff's awareness of his medications, in a Complaint Form dated November 3, 2004, plaintiff states that his HIV medications include "Sustiva, Videx and Epivere."

  ii. Plaintiff includes a letter to him from "Mindy" (whom he elsewhere identifies as the "ID [infectious disease] nurse"), which states: "**You have been approved to start hepatitis treatment** . . . You will begin your treatment on 1/10/05."

2. On February 24, 2005, plaintiff also filed a motion for a temporary restraining order, requesting that the defendants immediately provide him with Rockport shoes, testosterone injections, oxandrolone medication, dietary supplements, and methadose.

3. On **March 28, 2005**, defendant UMass Correctional Health (UMCH) filed an opposition to plaintiff's motion for a temporary restraining order. Therein, UMCH clearly identifies **Dr. Stone as a physician in the infectious disease clinic**. Furthermore, in addressing plaintiff's motion, UMCH states that "**the infectious disease specialist, Dr. Stone**" warned that increasing plaintiff's dose of methadose may affect the efficacy of his Sustiva and ddi (Videx) medications. UMCH also states, "given the doctor's concern, plaintiff is scheduled to meet with **Dr. Stone at the Infectious disease clinic**" in April, 2005 to discuss plaintiff's concerns.

UMCH also filed an Affidavit of its counsel, Attorney James Bello, in which **Dr. Stone** is yet again identified as the "**infectious disease specialist at the SBCC**." Attorney Bello states that Charlie Black (Health Services Administrator at SBCC) informed him that **Dr. Stone was concerned about the effect of the methadose on plaintiff's Sustiva and ddi medications**.

Both UMCH's opposition and the Affidavit of Attorney James Bello were served on the plaintiff.

4. On May 2, 2005, plaintiff filed his response to UMCH's opposition. Acknowledging his receipt of UMCH's opposition and the Affidavit of Attorney James Bello, plaintiff states that Charlie Black "lied to Attorney James A. Bello" because Sustiva blocks the absorption of methadone, not the other way around.

5. On May 2, 2005, plaintiff, *pro se*, filed a motion to amend his complaint to add Charlie Black and Lorraine Hazard, M.D. as party defendants, and to assert a claim of retaliation. In his motion, plaintiff restates the information that "**Dr. Stone**" allegedly told Charlie Black.

6.   On May 9, 2005, this Court (Woodlock, J.) appointed Bingham McCutchen LLP as pro bono counsel for the plaintiff.  On May 10, 2005, four attorneys filed Notices of Appearance on behalf of the plaintiff.

7.   **On May 16, 2005**, defendant UMCH filed a Status Report.  Therein, UMCH again identifies **Dr. David Stone as "one of the infectious disease specialists following [plaintiff's] care."**  In the section delineating the plaintiff's Medical Status, the report states, "**Mr. Audette is scheduled to be seen again this week by Dr. Stone in the infectious disease clinic**."

8.   **On May 16, 2005**, counsel for the plaintiff filed a Status Report as well.

   a.   Under the section "Background," the Report notes that Attorney Donald Savery and Attorney Brandon Bigelow <u>met with the plaintiff on May 9, 2005</u>.  On May 11, 2005, plaintiff's counsel requested a copy of plaintiff's medical record from the Court, filed by UMCH on March 15, 2005.  "**Counsel for Mr. Audette received that record from the Court on Thursday, May 12, 2005**, and engaged Howard Libman, M.D. . . . to assess Mr. Audette's medical record . . . and provide a preliminary assessment . . . ."  The report further notes that Attorney Bigelow <u>met with the plaintiff on May 13, 2005</u>.

   The UMCH records for the plaintiff include the following:

   i.    A 1/3/04 Sick Call Request Form by the plaintiff that states, "The **Shattuck** had written a recommendation to change viral meds to Sustiva." (Exhibit D).

   ii.   A 3/1/04 Progress Note by Nurse Melinda Bowen that states: "Cancelled **Lemuel Shattuck Hospital co-infection clinic visit** scheduled for 3/3/04. "<u>**Per 1/28/04 co-infection clinic note – RTC 1 month after starting Peg Rx.**</u>" (Exhibit D).

   iii.  A 3/10/04 Progress Note by Nurse Melinda Bowen that states: "Inmate seen in housing unit to fill out **Peg Access form for Peg Interferon RX. Inmate** has questions relative to HIV med and possible changes to __ - **states Dr. Bica from LSH mentioned changing to Sustiva.**  Check of co-infection note states refer to IDMD [infectious disease medical doctor] for change of Kaletra to Sustiva." (Exhibit C; see also Peg Enrollment form signed by the plaintiff).

   iv.   A 4/27/04 Progress Note by Nurse Melinda Bowen that was sent to the plaintiff, which states, "**I spoke to Dr. Stone about changing the Kaletra to Sustiva . . . Dr. Bica had suggested changing your med**…" (Exhibit D)

   v.    A 4/27/04 Progress Note by Nurse Melinda Bowen that states, "**Inmate states Dr. Bica had suggested switching Kaletra to Sustiva.**" (Exhibit D).

   vi.   A 4/27/04 Progress Note by Nurse Melinda Bowen that states, "Spoke to [infectious disease medical doctor- Dr. Stone] regarding inmate's wish to change Kaletra to Sustiva **as suggested by Dr. Bica in Jan. '04.**" (Exhibit D).

b.   Dr. Libman's preliminary report, based on his review of plaintiff's "detailed medical record," was also filed with the Court on **May 16, 2005**. Therein, Dr. Libman notes that the HIV drug ddi (Videx) should not be co-administered with the anti-HCV drug Ribavirin because of increased risk of severe lactic acidosis. Dr. Libman states, "in this setting, it would have been appropriate to substitute another drug for ddi and maintain his treatment for HCV if it was deemed effective."

c.   Under the section delineating the plaintiff's Medical Status, plaintiff's Status Report states, "Mr. Audette did not know, as of Friday, May 13, 2005, whether he would be scheduled to see the **HIV specialist** on May 17, 2005. According to the Status Report filed by UMass Medical, Mr. Audette will see a **Dr. Stone** later this week."

d.   Plaintiff's counsel also indicates that they are in the process of obtaining plaintiff's medical records from UMCH, **Lemuel Shattuck Hospital**, and New England Medical Center.

9.   On May 24, 2005, this Court (Woodlock, J.) denied *without prejudice* plaintiff's *pro se* motion to amend his complaint, and ordered that it be re-submitted by June 30, 2005.

10.  On June 29, 2005, plaintiff filed a motion to extend the time for filing his motion to amend the complaint to July 7, 2005. Plaintiff required an additional week to determine what claims would be asserted in the amended complaint. The Court (Woodlock, J.) allowed this motion on July 5, 2005.

11.  On **July 7, 2005**, defendant UMCH filed a Status Report. Therein, UMCH states that plaintiff "**is followed closely by Dr. David Stone**."

12.  On July 7, 2005, plaintiff also filed a Status Report. Under the section Medical Status, plaintiff notes that UMCH "removed the antiretroviral drug ddi (also referred to as 'Videx') from Mr. Audette's treatment regimen for human immunodeficiency virus."[1] The report further states that plaintiff's counsel has completed their initial investigation and have identified additional parties to be named and claims to be asserted in the amended complaint.

a.   On **July 7, 2005**, plaintiff also filed a *draft* copy of his **proposed first amended complaint**, naming Lois Russo (Superintendent of SBCC), Augustine Enaw, M.D., Lorraine Hazard, M.D., and Charlie Black as additional defendants. The "Factual Allegations" supporting plaintiff's medical malpractice claim stem from the co-administration of the HIV medication, ddi (Videx) with the HCV medication, Ribavirin, to the plaintiff, from January 10, 2005 to April 18, 2005.

---

[1] **Dr. Stone** is the physician who ordered that ddi be discontinued and that the plaintiff begin receiving Truvada and Sustiva instead, when he saw the plaintiff at the infectious disease clinic on May 29, 2005. Presumably plaintiff's counsel was aware of this information in informing the Court that ddi had been removed from plaintiff's HIV treatment regimen.

The draft amended complaint states that Dr. Enaw prescribed HCV therapy (Peg-Interferon and Ribavirin) for the plaintiff on January 3, 2005, at which time plaintiff was also receiving ddi (Videx) as part of his HIV regimen. The allegations further describe plaintiff's medical course in connection with the HCV treatment through May, 2005.

13.    On July 11, 2005, plaintiff filed a motion to extend the time for filing his motion to amend the complaint to July 22, 2005, in order to comply with Local Rule 15.1(B). The Court (Woodlock, J.) allowed this motion on July 12, 2005.

14.    On **July 22, 2005**, plaintiff filed a motion to amend the complaint, along with a copy of the **proposed first amended complaint**. (The "Factual Allegations" contained in the proposed first amended complaint concerning the co-administration of ddi and Ribavirin are the same as those made in the draft version submitted to the Court on July 7, 2005). Plaintiff asserted a lack of prejudice to the proposed defendants in that "discovery has yet to be undertaken." The Court (Woodlock, J.) allowed this motion on August 25, 2005, and further ordered that all non-expert discovery be completed by March 31, 2006.

15.    On August 25, 2005, a scheduling conference was held and the Court (Woodlock, J.) ordered that all non-expert discovery be completed by March 31, 2006.

16.    On August 26, 2005, plaintiff filed his first amended complaint with the Court (same as proposed first amended complaint filed on July 22, 2005).

17.    On **December 13, 2005**, plaintiff served defense counsel with a copy of his Offer of Proof.

    a.    In a footnote 1 to plaintiff's Offer of Proof, plaintiff acknowledges receipt of "an apparently complete copy of Mr. Audette's medical records from UMass Correctional Health through June 2005."

    b.    Exhibit E of plaintiff's Offer of Proof is comprised of a portion of plaintiff's medical records from UMass Correctional Health. **Included therein are the Progress Notes from Dr. Stone's examination of the plaintiff during the infectious disease clinic at SBCC on March 8, 2005, April 19, 2005, and May 29, 2005**.

    c.    Exhibit I of plaintiff's Offer of Proof is a letter from plaintiff's expert, Howard Libman, M.D., dated **November 4, 2005**, in which Dr. Libman states that, at the request of plaintiff's counsel, he has reviewed "the medical records of Mr. Audette from the Department of Correction, **Lemuel Shattuck Hospital**,[2] and New England Medical Center from October, 2001 through June, 2005."

18.    On February 24, 2006, plaintiff took the deposition of Michael Rodrigues of the Department of Correction.

---

[2] Lemuel Shattuck Hospital produced a certified copy of its medical records pursuant to c. 233, § 79G on October 20, 2005. Presumably plaintiff's counsel received the records then, if not earlier.

19.     On February 28, 2006, the parties filed a joint motion to extend the discovery deadline to May 31, 2006, anticipating that all non-expert discovery could be complete by that date. This Court (Woodlock, J.) allowed this motion on March 2, 2006, and extended the discovery deadline to May 31, 2006.

20.     On March 10, 2006, a Medical Malpractice Tribunal was held at Suffolk Superior Court. The Tribunal found in favor of the plaintiff as to defendants Augustine Enaw, M.D. and UMass Correctional Health.

21.     On May 8, 2006, the parties filed a joint Status Report and Proposed Revised Pretrial Schedule.  Among other things, the parties requested an extension of the discovery deadline to August 31, 2006.

22.     On May 10, 2006, this Court (Woodlock, J.) entered a Scheduling Order, pursuant to which discovery was to be completed by August 31, 2006, a status conference held on September 14, 2006, motions filed by October 16, 2006, and a pre-trial conference set for January 11, 2007.

23.     On **June 1, 2006**, plaintiff took the deposition of Melinda Bowen, R.N., the Infectious Disease Case Manager at UMCH.  Nurse Bowen testified, *inter alia*, **that the recommendation to treat an inmate's HCV "comes from the co-infection doctor at Lemuel Shattuck.  Then her recommendations are followed out and then if there's an issue then we can contact her....."**  Nurse Bowen further testified that a co-infected inmate *cannot* begin HCV treatment *without* the recommendation of the co-infection doctor at Lemuel Shattuck Hospital, and that co-infection doctor's recommendation for HCV treatment is relied on in providing the dosage for the inmate's Peg Interferon and Ribavirin.  (Bowen Depo, at 124-25; 218-219).

24.     On June 5, 2006, plaintiff took the deposition of Mark Schnabel of UMCH.

25.     On June 6, 2006, plaintiff took the deposition of Charles Black of UMCH.

26.     On June 27, 2006, plaintiff took the deposition of Philip Tavares, M.D. of UMCH.

27.     On August 3, 2006, plaintiff took the deposition of Lorraine Hazard, M.D. of UMCH.

28.     On August 22, 2006, plaintiff took the deposition of Augustine Enaw, M.D. of UMCH (originally noticed for June 27, 2006).

29.     On August 28, 2006, the parties filed a joint motion to extend the time to complete discovery and amend the scheduling order.  In addition, defendant UMCH sought leave to depose the plaintiff, and plaintiff sought leave to take up to 15 depositions.  Plaintiff stated that he needed an additional 90 days to complete discovery, including document requests and depositions of Dr. Bica, Dr. Stone, and Dr. Barbara McGovern.

        As reasons therefor, plaintiff stated that Dr. Enaw's deposition testimony on August 22, 2006 – that he relied on Dr. Bica's January 28, 2004 recommendation to start HCV

therapy when he ordered HCV for the plaintiff therapy on January 3, 2005, and that he relied on Dr. Stone to manage plaintiff's HIV care – was "**unexpected**." Plaintiff states that in light of Dr. Enaw's "unexpected" testimony, he **"cannot discount the possibility that other medical personnel may be responsible in part for the co-administration of" ddi and Ribavirin**. The parties requested an extension of the discovery deadline to November 28, 2006.

30.    On September 6, 2006, the parties filed a Joint Status Report and Proposed Revised Pretrial Schedule. Plaintiff states therein, "Mr. Audette completed all of the discovery he anticipated would be necessary to his claims, but discovered additional information that leads him reluctantly to conclude that further discovery is necessary to prepare his case."

31.    On September 14, 2006, this Court (Woodlock, J.) allowed the joint motion and ordered fact discovery completed by **November 28, 2006**, plaintiff's expert disclosures by December 13, 2006, defendant's expert disclosures by January 12, 2007, dispositive motions by January 12, 2007, rebuttal experts by February 1, 2007, expert discovery completed by March 2, 2007, status reports by March 3, 2007, and a status conference for April 12, 2007.

As will be set forth below, Dr. Bica and Dr. Stone respectfully request that this Court deny plaintiff's motion to amend his first amended complaint because of his inexcusable delay in seeking to add them as party defendants, notwithstanding that their identities were revealed long ago, and because allowance of this motion will result in unfair prejudice and further delay this litigation.

## ARGUMENT

I.    **THIS COURT SHOULD DENY PLAINTIFF'S MOTION BECAUSE OF THE DELAY IN SEEKING THE AMENDMENT, AND BECAUSE ALLOWANCE OF THIS MOTION WILL RESULT IN UNFAIR PREJUDICE TO DR. BICA AND DR. STONE AND CAUSE FURTHER DELAY OF THIS LITIGATION.**

A.    **Plaintiff's Delay In Moving To Amend His Complaint To Add Dr. Bica And Dr. Stone As Party Defendants, Despite Awareness Of Their Identities, Warrants Denial Of His Motion.**

Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend "shall be freely given" when justice so requires, "amendments, however, are not always permitted." *MacNeill Engineering Co. v. Trisport*, 59 F. Supp. 2d 199, 200 (D. Mass. 1999). Reasons justifying the denial of a motion to amend made pursuant to Rule 15(a) include: "undue

delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962); see also *Resolution Trust Corp. v. Gold*, 30 F. 3d 251, 253 (1st Cir. 1994) ("Leave to amend is to be 'freely given' unless it would be futile or reward, *inter alia*, undue or intended delay."). In *Palmer v. Champion Mortgage*, 465 F. 3d 24 (1st Cir. 2006), the Court stated:

> In appropriate circumstances – undue delay, bad faith, futility, and the absence of due diligence on the movant's part are paradigmatic examples – leave to amend may be denied. In short, a request to amend – **especially a belated request** – requires the court to examine the totality of the circumstances and to exercise its informed discretion in constructing a balance of pertinent considerations.

*Id.* at 30-31 (emphasis added).

Additionally, in ruling on plaintiff's motion to amend, this Court should consider Local Rule 15.1(A), which provides:

> Amendments adding parties *shall* be sought as soon as an attorney **reasonably can be expected to have become aware of the identity** of the proposed new party.

(Emphasis added).

Here, it is quite obvious, in light of the logical inferences to be drawn based on the "Relevant Background and Procedural History" set forth above, that the plaintiff certainly was aware or *should have been aware* of the identities of both Dr. Bica and Dr. Stone well before Dr. Enaw's deposition took place on August 22, 2006. The plaintiff himself acknowledged in his affidavit filed on February 24, 2005 that he had to wait *over a year* for Hepatitis C treatment, despite that fact that *it was ordered*. The obvious question is *who* ordered HCV treatment in 2004? Even if the plaintiff could not remember that Dr. Bica was the actual physician who had first recommended the HCV treatment (although a review of the UMCH records likely would have jogged his memory), plaintiff's attorneys were at least put on inquiry notice that *a* physician

had "ordered" HCV treatment a year before the actual treatment (that Dr. Enaw ordered) began on January 10, 2005. Plaintiff's counsel should have inquired as to as the identity of this physician. Furthermore, plaintiff's attorneys were in possession of the UMCH medical records as of May 12, 2005. Nurse Bowen's 3/1/04 Progress Note specifically identifies the co-infection clinic at Shattuck Hospital and references "the 1/28/04 co-infection note," as providing for the plaintiff to return to the co-infection clinic one month after starting HCV treatment. All that was left to do was to ascertain the identity of the physician who saw the plaintiff at Shattuck Hospital on 1/28/04 – information that plaintiff himself likely could have provided, given his impressive recall of the recommendation also made on 1/28/04 to switch his HIV medications. Dr. Bica's name is mentioned numerous times in the UMCH Progress Notes in early 2004, in connection with the change to plaintiff's HIV medications, and one 4/27/04 Progress Note ties her to January, 2004. Surely the plaintiff could have confirmed for his attorneys that Dr. Bica treated him at Shattuck's co-infection clinic. *At a minimum*, plaintiff's counsel was in possession of the Lemuel Shattuck Hospital records by November 4, 2005 (since plaintiff's expert, Dr. Libman, had reviewed those records by that point), and those very records contain Dr. Bica's 1/28/04 consult note. Plaintiff's attorneys could have brought suit against Dr. Bica as an unidentified defendant at the time the plaintiff's first amended complaint was filed was filed in July, 2005, and then added in her name in November, 2005 once they obtained the 1/28/04 consult note. Plaintiff also could have moved to add Dr. Bica in the first instance in November, 2005 as well, in accordance with Local Rule 15.1(A).

      The case is even more compelling for Dr. Stone. Defendant UMCH identified Dr. Stone as a physician in the infectious disease clinic at SBCC in filings to the Court as early as March, 28, 2005. Given the frequency with which Dr. Stone's name appears in the pleadings, in the medical records, and in forms filled out by the plaintiff himself, it is simply inconceivable that

*the plaintiff* was not aware of Dr. Stone's identity at the time the first amended complaint was prepared and filed in July, 2005. Furthermore, given how involved the plaintiff appears to be with his own health care, especially when it comes to his medications, it is unimaginable that the plaintiff was unable to identify Dr. Stone as the physician managing his HIV during the timeframe at issue (February to May, 2005) until Dr. Enaw was deposed on August 22, 2006.

Since May 12, 2005, plaintiff's attorneys were in possession of the UMCH medical records for the plaintiff – records which are replete with references to Dr. Stone in connection with plaintiff's HIV treatment. Plaintiff's attorneys also had available to them all of the pleadings filed with the Court that identify Dr. Stone as an infectious disease physician at SBCC. Furthermore, plaintiff included Dr. Stone's consult notes from visits with the plaintiff at the infectious disease clinic at SBCC in March, April, and May of 2005, in his Offer of Proof, which was served on counsel on December 13, 2005. Surely plaintiff's attorneys were also aware of Dr. Stone's identity well before Dr. Enaw's deposition on August 22, 2006.

Plaintiff had a duty to consider all potentially responsible parties once Dr. Libman raised the co-administration issue in May of 2005, providing the plaintiff with a basis upon which to assert his medical malpractice claim. Plaintiff has been aware of the factual predicate upon which he now seeks to add Dr. Bica and Dr. Stone since July 7, 2005, as evidenced by the draft copy of plaintiff's proposed first amended complaint filed with the Court on that date. The impetus was thus on the plaintiff and his counsel to consider "the possibility that other medical personnel may be responsible in part for the co-administration" *before* plaintiff moved to amend his original complaint on July 22, 2005. Plaintiff also had an opportunity to seek amendment in November of 2005, once they obtained a copy of Dr. Bica's 1/28/04 consult note.

Plaintiff asserts in his motion to amend that on **August 22, 2006** at the deposition of Dr. Enaw, he learned that Dr. Enaw relied upon Dr. Bica in connection with the treatment of

plaintiff's HCV condition, and relied upon Dr. Stone in connection with the treatment of

plaintiff's HIV condition.  Plaintiff is disingenuous in this respect.  On **June 1, 2006**, Nurse

Melinda Bowen testified that the recommendation to begin an inmate on HCV treatment comes

from the co-infection doctor at Lemuel Shattuck Hospital, and that that the recommendation is

relied upon in providing for the dosage of the inmate's Peg-Interferon and Ribavirin.  As such,

Dr. Enaw's testimony on August 22, 2006 could hardly have been "unexpected." It is more likely

that Dr. Enaw's disavowal of any responsibility over plaintiff's HCV and HIV conditions

prompted the plaintiff to re-evaluate his claims and seek additional targets.  Plaintiff's delay in

seeking amendment should not be excused.  "Among the good reasons for which a motion to

amend may be denied are that no justification for the lateness of the motion is apparent, **beyond**

**counsel for the moving party having had a late dawning idea** . . . ."  *DiVenuti v. Reardon*, 37

Mass. App. Ct. 73, 77 (1994) (emphasis added).

    In light of the plaintiff's actual or imputed awareness of the identities of Dr. Bica and Dr.

Stone and their respective involvements with his HCV and HIV care in relation to his medical

malpractice claim, the plaintiffs' delay in moving to add Drs. Bica and Stone as additional

defendants is inexcusable in this case, and justifies denial of his motion to amend.


    **B.    Dr. Bica And Dr. Stone Would Be Unfairly Prejudiced By The**
           **Allowance Of Plaintiff's Motion To Amend Complaint.**

    "Where a motion to amend comes after responsive pleadings have been served . . .  the

moving party must demonstrate an absence of prejudice to the nonmoving party."  *Data General*

*Corp. v. Grumman Systems Support Corp.*, 825 F. Supp. 340, 344 (D. Mass. 1993).  Here, the

prejudice that inures to both Dr. Bica and Dr. Stone in the event this motion is allowed is

undeniable.  It has now been nearly *three years* since Dr. Bica allegedly provided the treatment

at issue in this case, and nearly *two years* since Dr. Stone provided the treatment at issue in this

case. Moreover, it has been twenty-one months since the original complaint was filed, and over fifteen months since the amended complaint was filed. Yet, now, at the close of discovery (a deadline that has been extended three times), the plaintiff seeks to amend his first amended complaint to add Drs. Bica and Stone as additional defendants, without any credible explanation for the delay.

        If added to this lawsuit, Dr. Bica and Dr. Stone fall far behind the other parties, who have completed their discovery. Moreover, the plaintiff has already taken the depositions of Michael Rodrigues of the Department of Correction, Melinda Bowen, R.N. of UMCH, Mark Schnabel of UMCH, Charles Black of UMCH, Philip Tavares, M.D. of UMCH, Lorraine Hazard, M.D. of UMCH, and defendant Dr. Enaw. Counsel for Drs. Bica and Stone were not present at any of these depositions. It is inherently prejudicial to be added as party defendants as this late stage of the litigation.

    **C.    Allowing Plaintiff's Motion To Amend The Amended Complaint Would Frustrate The Court's Interest in Prompt Resolution Of Cases Because Of The Inevitable Delay That Would Result From The Addition Of Two New Party Defendants.**

        Additionally, if plaintiff's motion is allowed, and plaintiff is permitted to state a claim against both Dr. Bica and Dr. Stone, additional discovery will have to be done, additional witnesses may have to be deposed, and certainly another Medical Malpractice Tribunal will have to be scheduled. This case, which has already had its discovery deadline extended three times, could be protracted for years.

## CONCLUSION

        In accordance with Local Rule 15.1(A), plaintiff was required to bring a motion to amend to add Drs. Bica and Stone as soon as he reasonably could be expected to have become aware of their identities. It is patently clear that both the plaintiff and his attorneys were aware or should

have been aware of the identity of Dr. Bica and of Dr. Stone well before Dr. Enaw's deposition on August 22, 2006.  Yet, the plaintiff has failed to offer any credible explanation for why he did not seek to add Dr. Bica and Dr. Stone as party defendants long before now.  As the Court states in *Perlmutter v. Shatzer*, 102 F.R.D. 245 (D. Mass. 1984), "While leave to amend should be freely given, the time must arrive at some stage of every litigation when [plaintiff] must be required to stand upon the allegations he is asserting."  As in *Perlmutter* and so too here, "that time has arrived."

**WHEREFORE,** the proposed defendants, Ioana Bica, M.D. and David R. Stone, M.D., respectfully request that this Court deny plaintiff's Motion to Amend the First Amended Complaint.

Proposed defendants,
IOANA BICA, M.D. and
DAVID R. STONE, M.D.
By their attorneys,

**/s/ Daniel J. Griffin**
_____
Daniel J. Griffin, Esq.  (BBO#211300)
Jennifer E. Hartunian (BBO#660902)
Martin, Magnuson, McCarthy & Kenney
101 Merrimac Street, 7th Floor
Boston, MA 02114
(617) 227-3240

Date: December 1, 2006

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon counsel of record for each other party via first class mail on the 1st day of December, 2006.

**/s/ Daniel J. Griffin**
_____
Daniel J. Griffin

# *Exhibit A*

# CORRECTIONAL MEDICAL SERVICES / UMASS

## PROGRESS NOTES

_____ Conc _____
Institution

NAME: Andette Lloyd     ID # W80971     D.O.B. 12-31-58

| DATE | TIME | NOTES |
|------|------|-------|
| 2/19/02 | ID clinic | HIV - dx. late 80's - early 990 ('89-'90) |
| | | dr. Miller - New Bedford Community Health Center |
| | | CD4 < 200 several times. |
| | | h/o PCP x 3 |
| 11/15/02 | | Hep C. |
| | | last CD4: 320 (8/02) ART s'ed 2 3/02 Kaletra |
| VL <50 copies/ml | | VL < 50 (8/02) to Epivir |
| D4: 284 (18%) | | testosterone (0-80) → level 19 Videx |
| | | (Fortovase / Epivir / Videx) |
| T.4) 40.9 (193 | | fatigue ⊕, otherwise ROS ⊖ |
| | | PE ∅ Pepcid/Robitussin |
| | | Bactrim : Tri |
| | | Imp nu |
| | | ① HIV/AIDS with slight ↓ in CD4 count Motrin |
| | | (per report, MR N/A) but complete |
| | | virologic suppression : VL-CD4 -IVDU - started 198? |
| | | disconnect phenomenon ∅ Etoh |
| | | - discussed extensively implications of above situation |
| | | ? IL-2 - not yet FDA approved for HIV inf, ☐ oxandrolone |
| | | f/u studies, etc ☐ testosterone - inj. |
| | | - cont to emphasize compliance (last 14 mos af |
| | | close f/u ; cont present ART regimen ☐ testosterone total? |
| | | - advised consideration for Rx of Hep C ☐ thermal underwear |
| | | as may contribute to ↓ CD4 count. (anecdotally) |
| | | ② ? hypogonadism → ↓ free/total testosterone |

ID CLINIC

# CORRECTIONAL MEDICAL SERVICES / UMASS

## PROGRESS NOTES

Concord
_Institution_

NAME: _Audette Boyd_    ID # _W80971_    D.O.B. _12-31-58_

| DATE | TIME | NOTES |
|------|------|-------|
| | | ③ Hep C — ↓LFTs, discussed relativity of normal RFTs, will consider Rx although concerned about side effects of IFN (Riba (brother treated). — ✓PT/INR, ✓AFP |
| | | F/U labs in Jan '03. |
| | | Price (BICA) |

*Exhibit B*

**Lemuel Shattuck HOSPITAL**

### Clinic Visit ~ Follow-up Consultation

Date: 1/28/04    Clinic: _GI Inf Co-Mx_    Primary Provider: _____

Vital signs: BP 128/86    P 56    RR 18    Temp 97.8    Wt 180    O2-Sat 98/%

A: F/u visit c H/o Hep C, HCV (+)
Liver biopsy 12/5/03   seen by Co-Inf 5/7/03

P: exam / see assess + plan    Labs
drawn Chem 20  Hgb A1C  results pending

VDO carefully pt to start Peg INF / Rib

F/u Consig  1mo p starting PegRx

M: HIV / HCV coinfected, with lipodystrophy
syndrome (predominantly abdominal
adiposity) reporting improvement c stopping
ART (which he periodically does for both
CNS and ↑ liver enzymes)

Kaletra
Epivir
Videx EC

↑ on ART at present

Liver Bx 12/5/03: only 2 portal tracts. 1/2 tracts: mild chronic inflammation
minimal fibrosis, ⊖ necrosis, ⊖ hemosiderin, ⊖ steatosis ; cannot evaluate HAI
score
HCV genotype 1a

RVS ⊖                                    Lab 1/15/04

PE: VSS   ii NAD
    ⊖ facial atrophy, ⊖cclual icterus
    (+) epigastric lipomas x2, ⊖ stigmata of
    cirrhosis , ⊖ thrush
    lungs CTA
    heart RRR S1S2 ⊖ m
    abd ⊕⊕⊕, NT, NT, ⊖ HSM / masses
    extrem ⊖ edema

Lipase: 36    T.chol 237
Amylase: 100    TG: 262
AST/ALT : 78/61.11 alb
free/total testosterone

Page ___ of ___

Consultant's Signature/Print: _____

Phone/Beeper: _____

RTC: _____

White Copy: Medical Records    Yellow Copy: Requesting Practitioner

OPD LS.06/01

Addressograph

LS0000558254    LS00056059
AUDETTE, LLOYD    12/31/1958
(617) 727-1480    GAS.L M
UMASS CORRECTI

**Lemuel Shattuck HOSPITAL**

## Clinic Visit ~ Follow-up Consultation

Date: 1/28/04    Clinic: Co-inf    Primary Provider: Brica

Vital signs: BP_____ P_____ RR_____ Temp_____ Wt_____ O2-Sat_____

Imp ① HCV - probably mild hepatitis despite higher probability of sampling error on liver biopsy

— would give trial of Peg IFN/RBV, discussed extensively side effects from depression (cytopenias/proteinuria/thyroiditis), HA, visual changes, etc.

— please ask for formal psychiatric evaluation in anticipation of Peg IFN/RBV

— please consult ophthalmology - baseline retina exam

Would — start Peg IFN 120 micrograms sc q weekly

— start Ribavirin 400 mg po BID

— √ CBC c̄ diff / LFT / Bun, creat q 2 weeks x 2, then q monthly. Call us with ANC < 1000 cells/mm³ / ↓ Hct < 30.

— √ TSH / fasting lipid profile q 3 mos

— HCV RNA at 3 mos, 6 mos, 48 weeks of therapy

② Lipodystrophy syndrome — please refer to dr Onirk - his care provider re ✓ need for switch therapy (Kaletra → Sustiva (NNRTI)

— HbA1C (P) (obtained today at LOH), which may impact decision about antiretrovirals.

Flu coinfection clinic at 1 month following start of Peg IFN/RBV

Page____ of____

Consultant's Signature/Print: Brica

Phone/Beeper: IOANA Boca MD

RTC: 6/ # 617 604 6625

White Copy: Medical Records    Yellow Copy: Requesting Practitioner

OPD.LS.06/01

Addressograph

LS0000558254      LS00056059
AUDETTE, LLOYD    12/31/1958
(617) 727-1480
                  GAS.L M
UMASS CORRECTI

*Exhibit C*

# CORRECTIONAL MEDICAL SERVICES / UMASS
## SICK CALL REQUEST FORM

Print Name: _Lloyd Audette_          ID#: _W80971_

Date/Time _4-21-04_          Housing Location: _K-1 cell 19_

Check **ONLY** One Box:          ☑ Medical          ☐ Dental          ☐ Mental Health

Nature of problem or request: _Need to see Dr Stone, IDClinic, have_
_problem with meds (and other issues) 2nd request, next request will be_
_a grievance, also put slip in about knee 4wks ago._

I consent to be treated by the healthcare staff for the condition described above.

Inmate Signature _Lloyd Audette_

### PLACE THIS SLIP IN MEDICAL BOX OR DESIGNATED AREA
### DO NOT WRITE BELOW THIS AREA

*****************************************************************************

| Date/Time Recieved | | REFERED TO: |
|---|---|---|

Institution _SCC_          REFERED TO:

Date/Time Recieved: _4/22/04 11:00_

Slip Sorted by: _____

☐ Nurse      ☐ Midlevel      ☐ Physician

☐ Mental Health    ☐ Dental    ☐ Other

*****************************************************************************

Subjective: _As Above._

Objective: T _Na_   P _____   R _____   B/P _Na_
_Spoke c̄ Inm in Housing Unit –_
_see note dated 4/27/03_

Assessment:

Plan [include inmate education]:

Signature & Title: _MJ Brown RN_          Date: _4/27/04_ Time: _11:00_

MS 8022 Rev. 4/01

# UMASS CORRECTIONAL HEALTH
## PROGRESS NOTES

Institution: SBCC

NAME: Audette, Lloyd     ID # 680971     D.O.B. 12-31-58

| DATE | TIME | IDCU     NOTES |
|------|------|------|
| 3/10/04 | 1030 | Inmate seen in housing unit to fill out Pea Access Form fit Peg Interferon Rx. Form faxed to UMACHP - Dr Brewer & Dr Pharm. Inmate has questions RIT this med and possible A's to PI - states Dr. Bica from LSH mentioned Aixa to Sustiva dIT Abdominal adiposity (per inmate). Checked conf note reveals mention of lipodystrophy - "predominantly abdominal adiposity" but no mention of A of meds in note, error. - Note states refer to IDMD for A of Kaletra - Sustiva + HgA1C obtained @ LSH 7/28/04 "result may impact decision RIT Antiretrovirals". Will Call LSH for results & Flu c̄ IDMD. Inm also had concern RIT having PM snack c̄ Kaletra - but snack is ↑ diarrhea - bran cereal - will address c̄ IDMD. |
|  |  | ~ MJBrewer RN |

7113W 1/95

24152

# PEG-INTRON Access Assurance Enrollment Form

SP09 10.2001

**INSTRUCTIONS:** Please fill out this sheet and fax to the number below. Fill in bubbles completely. Please print neatly. Make your letters and numbers like this:

A B C D I 1 2 3 4

PEG-INTRON™
Peginterferon alfa-2b   Powder for Injection

SBCC

## PATIENT INFORMATION

**DATE OF BIRTH:** 12 / 31 / 1958
MONTH / DAY / YEAR

**TITLE**
○ Ms   ● Mr   ○ Mrs   ○ Miss   ○ Dr

**PATIENT'S FIRST NAME:** LLoyd
**M**
**PATIENT'S LAST NAME:** Audette

**ADDRESS:** Correctional Facility

**CITY:**
**STATE:** MA
**ZIP:**

**PATIENT WT (LBS.):** 178
**PHONE:** (   )    -

**IS THIS YOUR FIRST PRESCRIPTION FOR PEG-INTRON?** ● Yes   ○ No

**PATIENT GENDER**
● Male   ○ Female

**BEST TIME TO BE CONTACTED**
○ Morning   ○ Afternoon   ○ Evening

**IF NOT FIRST PRESCRIPTION, DATE PEG-INTRON THERAPY STARTED**
MONTH / DAY / YEAR

**HEALTH PLAN:**

**DO YOU HAVE A NEW OR EXISTING PRESCRIPTION FOR PEG-INTRON™?** ○ Yes   ● No

**DO YOU HAVE A PRESCRIPTION FOR REBETOL® (RIBAVIRIN, USP) CAPSULES OR RIBAVIRIN?** ○ Yes   ● No

## PHYSICIAN INFORMATION

**PHYSICIAN'S FIRST NAME:** Brewer
**M**
**PHYSICIAN'S LAST NAME:** Arthur

**PHYSICIAN'S ADDRESS:** 270 Bridge St

**CITY:** Dedham
**STATE:** MA
**ZIP:** 02026

**PHYSICIAN'S PHONE:** (978) 863-9037

**CONSENT TO CONTACT YOUR PHYSICIAN?** ○ Yes   ● No

**WOULD YOU LIKE TO RECEIVE INFORMATION ABOUT THE BE IN CHARGE™ PROGRAM?** ○ Yes   ● No

**CONSENT:** PEG-INTRON Access Assurance has been developed to ensure that once a patient commences PEG-INTRON therapy and is actively enrolled in PEG-INTRON Access Assurance, the patient has access to a full length of therapy. If demand for PEG-INTRON™ exceeds current supply, drug will be reserved for active participants in PEG-INTRON Access Assurance to ensure completion of their PEG-INTRON therapy. If for some reason you decide to discontinue PEG-INTRON therapy, please contact us so we can update our records and reallocate drug to other patients. If it appears you've discontinued therapy and we've not heard from you, we need to contact you to confirm your drug can be reallocated.

As the patient, do you give administrators of PEG-INTRON Access Assurance permission to contact you if you have not received PEG-INTRON™ in a timely fashion during any point in your therapy? ○ Yes   ● No

**IF YOU SELECT "NO":** If you have indicated you do not want to be contacted regarding receiving your PEG-INTRON™ during the course of your therapy, we want to be clear on the following. In any 60-day period during your therapy, if through our system it indicates you have not picked up your PEG-INTRON™, your PEG-INTRON Access Assurance ID# will be automatically inactivated. If you require subsequent therapy after that 60-day period you have to re-enroll in PEG-INTRON Access Assurance.

Additionally, you are only required to provide your full first and last name to enroll.

**YOUR SIGNATURE IS REQUIRED TO PROCESS THIS FORM.**

X _Lloyd Audette_
**PATIENT SIGNATURE**

By signing this form you give administrators of PEG-INTRON Access Assurance permission to enroll you in the PEG-INTRON Access Assurance Program and fax back a confirmation of your enrollment.

**FAX NUMBER TO SEND RESPONSE:** (978) 863-9960

**In the event that you do not fill your prescription for PEG-INTRON™ within any 60-day period, your PEG-INTRON Access Assurance ID number may be deactivated and we can no longer ensure product availability for you.**

SBCC
3-04

# FAX COMPLETED FORM TOLL-FREE TO: (866) 827-8185

PEG-INTRON Access Assurance is brought to you as a service by Schering Corporation

24152

Please see enclosed full Prescribing Information.

PG0148 11/01

Audette, Lloyd
W80971

December 28, 2004

Re:   Approval To Start Hepatitis C Treatment

Please be advised that your name has come up to begin the Hepatitis C Treatment. You will be contacted within the next week to discuss the treatment plan that includes weekly injections and pills twice a day. There are a few things that will be happening before your treatment will start. A new hepatitis C viral load has been ordered-this needs to be drawn before you start your treatment so when we check the progress of the treatment (at 12 weeks) we have an accurate number of how much virus was in your blood just before you started treatment. I will also be scheduling those of you who haven't had their baseline eye exam yet.

I will speak with you individually next week to discuss possible side effects and ways to prevent them or at least ease the burden of them. I am sure you have heard many stories about the Hepatitis treatment and the side effects. I can only say that everyone is different and the side effects are also very different with each person.

Most people tell me that by increasing their fluid intake (recommendation is 1/2 your body wt in ounces everyday) ex. 150 lbs = 75 ounces fluid everyday (about 9-8oz glasses). This seems to flush the toxins out of your body. They also say the first few injections are the worse (fever, chills, muscle aches, nausea, headaches) but as the month goes on the effects become less bothersome.

The strain of your hepatitis (genotype) will determine the length of your treatment. Treatment is either 24 weeks-6 months or 48 weeks-11 months. I will discuss your treatments with you in person.

Congratulations. See you next week.

Mindy Bowen RN
Infectious Disease Case Manager

# UMASS CORRECTIONAL HEALTH

## PROGRESS NOTES

SBCC
_Institution_

NAME: Audette, Lloyd     ID # W80971     D.O.B. 12/31/58

| DATE | TIME | IDCM                                      NOTES |
|------|------|--------------------------------------------------|
| 12/28/04 | 1500 | IDCM Notified by HCV Coordinator @ UMCH PM approved to start HCV Rx c̄ Peg + Ribavirin Note sent to IM RT Approval - will discuss in detail next week.  ~ MJBauer RN |
| 1/3/05 | 1000 | IDCM MH notified of pending HCV Rx, not presently an open MH case - Baseline eye exam also requested will FU c̄ this week.  ~ MJBauer RN |
| 1/3/05 | 1430 | IM approved to start HCV Rx - will discuss possible S/E's + prophylaxis c̄ IM, IM pt to start Rx 1/10/05  ~ MJBauer RN |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

7 113W 1/95

Audette, Lloyd

You have been approved to start hepatitis treatment. I try to work closely with you especially in the first month this seems to be the worse time for side effects. I am here on Mondays and Tuesdays, if you have an immediate issue you need to place a sick slip or contact the nurse in your block.

You will begin your treatment on __1/10/05__. I have given you the scheduled labs that are requested during your treatment. The first month there are many labs due to the medications possibly altering your blood counts. A close eye is kept on them and any adjustments that are needed are made.

We will follow up via ~~teleconference~~ co-infection with the ~~at~~ docs at LSH after your 12-week HCV viral load comes in. Lab is scheduled for __4/4/05__. This lab test will tell the doctors how well the medication is working. If there isn't a significant drop in virus in your blood, treatment may be cancelled until something better is developed. Their research has shown that if the treatment isn't working at the 12-week mark then the chances of it failing is high. So they may chose to discontinue the treatment at that time.

Meanwhile, I have ordered your HCV Rx as I told you. So starting on Monday __1/10/05__ you will begin taking 2 Ribavirin Pills in the AM and 2 pills in the PM. You will also get your first injection of __Peg__ Interferon in the afternoon on Monday, then every __Monday__ afternoon after that.

You can get through this treatment. We will work together to get through any side effects you may have.

Here are some helpful interventions for possible side effects you may encounter:

| Side Effects | Interventions |
|---|---|
| Fatigue | Hydration (1/2 body wt. in oz. every day) moderate exercise, conserve energy |
| Flu like symptoms | Alternate Tylenol & Motrin  Tylenol lasts 4 hrs    Motrin lasts 8 hrs |
| Loss of Appetite | Eat multiple small meals  Instead of 3 large meals |
| Depression | Report immediately side effect of medications- can be controlled |
| Insomnia | Report immediately side effect of medications- can be controlled |

Mindy

**SS CORRECTIONAL HEALTH**

## PHYSICIAN'S ORDER

PRESCRIPTION ORDER – FOR DEPARTMENT OF CORRECTION INSTITUTIONAL USE ONLY

NAME _Audette, Lloyd_    ID NUMBER _W80971_    D.O.B. _12/31/58_

INSTITUTION _SBCC_    ALLERGIES _Codiene_

DATE _1/8/05_    TIME _1400_

**ORDERS**

Patient Registration # _To Start Rx 1/10/05_ * Current Weight: _156.5 #_

---

**#1: Peg-Intron (pegylated interferon alfa-2b)**  *Doses correspond to tx with Ribavirin Only

☐ **First Order, start when medication available**    ☐ Renewal/Refill order

| | Patient weight | Dose | | vial strength |
|---|---|---|---|---|
| | < 40  kg  (<88 lb.) | 0.5 mL (50 mcg) | of | 100 mcg/mL (50 mcg/0.5mL) |
| | 40-50 kg  (88-110 lb.) | 0.4 mL (64 mcg) | of | 160 mcg/mL (80 mcg/0.5mL) |
| | 51-60 kg  (111-132 lb.) | 0.5 mL (80 mcg) | of | 160 mcg/mL (80 mcg/0.5mL) |
| ✓ | 61-75 kg  (133-165 lb.) | 0.4 mL (96 mcg) | of | 240 mcg/mL (120 mcg/0.5mL) |
| | 76-85 kg  (166-187 lb.) | 0.5 mL (120 mcg) | of | 240 mcg/mL (120 mcg/0.5mL) |
| | > 85  kg  (>187 lb.) | 0.5 mL (150 mcg) | of | 300 mcg/mL (150 mcg/0.5mL) |

Inject subcutaneously once weekly on _Monday_ (day of week) X ~~28 days~~
@ 1600                        X 14 days

---

**#2:   Rebetol (ribavirin capsules)** *Please Check appropiate dose and list when indicated.

_____ 2 x 200 mg capsules (400mg) po qAM

_____ 2 x 200 mg capsules (400mg) po qPM   X _____ days

✓   Dose Adjustment: _400_ mg po qAM and _400_ mg po qPM X _14_ days
  **(Based on consult or hematological decline)**

Please send @ 2 weeks worth - (will Renew 1/17/05)
Alternate
Tylenol 650 mg PO TID/PRN X 100 days KOP  c̄
Motrin 600 mg PO BID/PRN X 100 days KOP

SIGNATURE _____    Interchange is mandatory unless the prescriber writes the words "no substitution" in this space:

PT NAME: _A. ENAW, M.D._

## UMASS CORRECTIONAL HEALTH

### PROGRESS NOTES

Institution: SBCC

NAME: *Audette, Lloyd*    ID # W80971    D.O.B. 12/31/58

| DATE | TIME | NOTES |
|------|------|-------|
| 3/3/05 | 1015 | **I.D. CLINIC** BP 130/84 HR 87 wt 147# |
| | | Started int/rharam in *the* Jms. on MMI, 3TE & syst. |
| | | CD4 - 137 15%. Unenched. |
| | | GST - 31. |
| | | E̅ nod. phinx ⊖ min LN lung - clear wrm abd ⊖ |
| | | ⓐ A/us Her-on (s. |
| | | ① Flw in 3 mo. Bactrm DS ī po god — |

## UMASS CORRECTIONAL HEALTH
### PROGRESS NOTES

SBCC
**Institution**
12/31/58

NAME: Audette, Lloyd      ID # W80971      D.O.B.

| DATE | TIME | NOTES |
|------|------|-------|
| 4/19/05 | 1035 | **I.D. CLINIC** BP 136/92 HR 115 |

Large visual defect noted x 1 wk in the R eye.

On exam - I am unable to notice a diffuse return the R+L fundi.

We need to r/o optic neuritis or vascular defect in the eye. ? retinal.

Suggest:

① Opthal ASAP for dx

② To determine safety of continued INT/ribavirin (after dx made).

7119W 1/05

# UMASS CORRECTIONAL HEALTH

## PROGRESS NOTES

_____ SBCC _____
Institution

NAME: Durelle Lloyd          ID # W80971   D.O.B. 12/31/58

| DATE | TIME | IDCH / NOTES |
|------|------|------|
| 5/24/05 | 1430 | ID Clinic note received from LSH visit on 5/20/05 - Will speak c̄ SBCC MD for orders ~ M Bower RN |

## I.D. CLINIC

BP 129/88  HR 93  wt. 146.5#

| 5/26/05 | 1015 | |

Res ill.

CD4 baseline 98.   VL (?)

To Start truvada + sustiva tonight.

c̄ meds.

flux ⊖

GI ⊖

lung - clear    c.or w/ S.S.

LAD ⊖

(A) AIDS

HCV

(P) restart HIV meds

VL, CD4, CBC, BUN, cont. in clinic.

[signature]

7118W 1/95

*Exhibit D*

ATT. Laura/Dr Quirk
ID Clinic

## UMASS CORRECTIONAL HEALTH
## SICK CALL REQUEST FORM

Print Name: _Lloyd Audette_     ID#: _W 80971_

Date/Time _1-03-04_     Housing Location: _RB 222_

Check **ONLY** One Box:   ☑ Medical   ☐ Dental   ☐ Mental Health

IB
1/03/04

Nature of problem or request: _The Shattack had written a recommendation to change_
_viral meds (kaletra, epivere, videx) to sustiva. Kindly review evaluation._
_Thank you_

I consent to be treated by the healthcare staff for the condition described above.

Inmate Signature _Lloyd Audette_

## PLACE THIS SLIP IN MEDICAL BOX OR DESIGNATED AREA
## DO NOT WRITE BELOW THIS AREA

*********************************************************

| Date/Time Recieved | MCI-W | REFERED TO: |
|---|---|---|
| 2/4/04 8 Am | Institution | ☐ Nurse   ☐ Midlevel   ☐ Physician |
| | D | ☐ Mental Health   ☐ Dental   ☒ Other _HIV_ |
| | Slip Sorted by: | |

*********************************************************

Subjective:

Objective: T _____ P _____ R _____ B/P _____

Assessment:

Plan [include inmate education]:

See @ ID Clinic 2/4/04 by Dr Quirk to recommendation to D/C Meds @ this time

Signature & Title: _Laura Vuceirullo LPN_   Date: _2/4/04_   Time: _7¹_
IDCN

8022 Rev. 4/01

# UMASS CORRECTIONAL HEALTH

## PROGRESS NOTES

_Norfolk_
Institution

NAME: _Audette, Lloyd_     ID # _W80971_     D.O.B. _12/31/68_

| DATE | TIME | NOTES |
|------|------|-------|
| 3/23/04 | 1:00 PM | Nutrition (Chart review) In Seg. (SMU) Wt 2/4/04. 177# (Stable) Labs body Gluc. 86, BUN/Cr WNL, Chol 256 Trig 320, HDL 37 LDL 155 1/04. CD4 258 (15%), VL <75    Meds: Didanosine EC 10/03. CD4 324 (15%), VL <75.    Epivir ~~Zerit~~ MT Diet order: Reg + pm snack.    ~~~~ Very stable wt, Excellent labs. ↑ lipids d/t HAART per MD note on 2/4/04 Pt asymptomatic ⊕ All w/end l/o/d from R.B. ⊕ Will monitor/reassess Michelle Cruz RD, LDN |
| SBCC * | | |
| 3/1/04 | 1410 | Reviewing chart for SBCC - Cancelled LSH co-infection clinic visit scheduled for 3·3·04. Per 1·28·04 co-infection clinic note - "RTC 1 month p̄ starting Peg Rx. Will schedule p̄ starting Rx. ~ M J Bowen RN |
| 3/1/04 | 1430 | Scheduled Inm for annual cxe + optho. exam also asked for Retinal exam for baseline ā starting Hcv Rx. Will find out from Inmate if he was filled out Reg Access form which needs to faxed |

7113W 1/95

# UMASS CORRECTIONAL HEALTH

## PROGRESS NOTES

Institution _____

NAME: Audette, Lloyd          ID # _____  D.O.B. _____

| DATE | TIME | NOTES |
|------|------|-------|
| Sent to I/M 4-27 via nurse mail MB | | 4.27.04 |

Lloyd:

I spoke with Dr Stone about changing the Kaletra to Sustiva. He is coming to SBCC in the next few weeks and would like to see you before changing anything. Also while reviewing your chart I noticed Dr Quirk had seen you in clinic after Dr Beca had suggested changing your med — Do you know why he didn't change it at that time?

I spoke to the dietician and she said Bran would be best for your diarrhea — but you might want to try writing food services.

I also spoke with Dr Enaw the medical director @ SBCC. He also would like to see you before addressing the neuropathy pain. — I also discussed the testosterone issue and the notes look as though you were receiving the injections/gel due to decrease in free testosterone — your levels from teba were within normal range.

I will call you to the HSU for your appointments ① Dr Enaw ② Dr Stone

Mindy Bowen

# UMASS CORRECTIONAL HEALTH

## PROGRESS NOTES

_SBCC_
Institution

NAME: Audette, Lloyd    ID # W80971    D.O.B. 12-31-58

| DATE | TIME | NOTES |
|------|------|-------|
| 3/30/04 | 1430 | Follow-up: Neg ⊕, HCV (known to RD MCI-Concord) wt: 176# stable. IM o N/V, c/o diarrhea 2° (pm Thu) meds. Concerned c̄ lipodystrophy and wants to ∆ meds. Also concerned c̄ ↑ lipids - (1/04) chol = 256. trig = 350, HDL = 37. LDL = 155. States appetite good - "likes to eat." o caution. exercising on regular basis. wants to ↓ body fat. To be evaluated by Dr. Shaw. continue to monitor. —————— S Bingham RN, MS RD LDN |
| 4/27/04 | 1120 | IDCH. Spoke c̄ I/M housing unit. Has c/o ↑ diarrhea lumps on abd & small red spots on trunk. I/M states Dr. Bica had suggested switching ① Kaletra to Sustiva. - Also on 3TC & DDI EC - (previously on Fortavase caused stomach issues) Genotype done 10/5/01 - results → "sensitive" to all drugs listed② States Tg & chole ↑ ③ only getting Bran Flakes for HS snack ④ wants pain medication for neuropathy & joint pain. Will discuss c̄ RD HCU & SBCC medical director - N J Boomer RN |

# UMASS CORRECTIONAL HEALTH

## PROGRESS NOTES

SBCC
Institution

NAME: Audette, Lloyd     ID # W80971   D.O.B. 10-31-58

| DATE | TIME | IDCM          NOTES |
|------|------|--------------------|
| 4/27/04 | 1510 | Spoke c̄ IDMD regarding Above Inmates wish to ɐ̄ Kaletra to Sustiva as suggested by Dr. Bica in Jan 04. Dr. Stone would like to meet c̄ Inmate as he is new to SBCC and Dr. Stone. Will schedule for next IDMD visit. Spoke c̄ RD e/t pt snack being bran flakes - suggests - bran flakes are best tolerated c̄ diarrhea. Discussed Neuropathy + bilateral joint pain c̄ SBCC medical director. Dr. Enas would like to assess Inmate c̄ prescribing any medications - will schedule c̄MD |
| | | ~ MJBowen RN |

7113W 1/95