UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LLOYD F. AUDETTE,<br><br>              Plaintiff,<br><br>     v.<br><br>UMASS CORRECTIONAL HEALTH PROGRAM, a program of the UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL; AUGUSTIN ENAW, M.D.; and NEW ENGLAND MEDICAL CENTER HOSPITALS, INC.,<br><br>              Defendants. | CIVIL ACTION<br>NO. 05-10403-DPW |

## SECOND AMENDED COMPLAINT

Pursuant to Rules 15(a) and 15(d) of the Federal Rules of Civil Procedure, and with the written consent of all parties, plaintiff, Lloyd Audette, respectfully amends his First Amended Complaint as follows:

### Introduction

This is a civil action to redress the deprivation by Defendants of rights secured to Plaintiff, Lloyd F. Audette, an inmate at the Souza-Baranowski Correctional Center in Shirley, Massachusetts, by the Constitutions and laws of the United States and the Commonwealth of Massachusetts, as well as for medical malpractice. Defendants, UMass Correctional Health, Augustin Enaw, M.D., and New England Medical Center Hospitals, Inc. negligently caused Mr. Audette to receive medications or allowed Mr. Audette to continue to receive medications in a dangerous combination that resulted in serious physical harm and emotional distress to Mr. Audette. Mr. Audette seeks prospective injunctive relief, compensatory and punitive damages, and attorneys' fees and costs, as authorized by 42 U.S.C. § 1988.

**Parties**

1.      Plaintiff Lloyd F. Audette ("Mr. Audette") is currently incarcerated at the Souza-Baranowski Correctional Center in Shirley, Massachusetts ("SBCC"), a penal institution operated by the Massachusetts Department of Correction ("DOC").

2.      Defendant UMass Correction Health Program ("UMass Correctional Health") is a program of the University of Massachusetts Medical School ("UMMS"), with a principal place of business in Westborough, Massachusetts. Since January 1, 2003, UMass Correctional Health has provided medical services to inmates in the custody of the DOC pursuant to an agreement between UMMS and the DOC.

3.      Defendant Augustin Enaw, M.D. ("Dr. Enaw") is the medical director at SBCC and is affiliated with UMass Correctional Health. At all times relevant to this Second Amended Complaint, Dr. Enaw provided medical care to inmates at SBCC, including Mr. Audette.

4.      Defendant New England Medical Center Hospitals, Inc. is a Massachusetts corporation with a principal place of business in Boston, and provides certain consulting medical services to the DOC regarding inmate health care.

**Jurisdiction and Venue**

5.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction), 1343 (civil rights jurisdiction), and 1367 (supplemental jurisdiction).

6.      Venue is proper pursuant to 28 U.S.C. § 1391(b).

**Factual Allegations**

*Co-administration of Videx and Ribavirin*

7.      In October 2001, Mr. Audette became a patient in the DOC healthcare system. As of January 1, 2003, the DOC contracted with UMMS through UMass Correctional Health to provide medical services at DOC facilities, including the SBCC.

8.      At the time he became a patient in the DOC healthcare system, Mr. Audette was infected with and receiving treatment for, among other things, HIV. Mr. Audette was diagnosed

as HIV-positive in the late 1980s, and has been receiving treatment for that condition ever since. At the time he became a patient in the DOC healthcare system, Mr. Audette had been diagnosed as being infected with HCV.

9. On or about January 3, 2005, Dr. Enaw ordered that Mr. Audette begin treatment for his HCV condition the following week. Dr. Enaw prescribed a combination therapy of pegylated interferon ("Peg-Intron") and Ribavirin (together, "HCV combination therapy") for Mr. Audette in connection with that treatment.

10. At the time Dr. Enaw issued this order, Mr. Audette had already been receiving a combination of medications to suppress the viral load of HIV in his body. These medications included ddI (also referred to as "Videx"), 3TC (also referred to as "Epivir"), and EFV (also referred to as "Sustiva"). The combination of these drugs sometimes is referred to colloquially as an "anti-HIV cocktail."

11. In making this order, Dr. Enaw relied upon recommendations from consultants that had grown outdated. Upon information and belief, these recommendations had become outdated due to the failure of UMass Correctional Health and New England Medical Center Hospitals, Inc. to reasonably coordinate scheduled medical consulting services for inmates.

12. At the time Dr. Enaw ordered that Mr. Audette receive HCV combination therapy together with his anti-HIV cocktail, it was recognized in the medical community that the antiretroviral drug ddI should not be coadministered with the anti-HCV drug Ribavirin because of an increased risk of severe lactic acidosis, peripheral neuropathy, and pancreatitis.

13. Peripheral neuropathy refers to a variety of painful nerve conditions that result from nerve damage. Lactic acidosis, an excess of lactic acid in the blood, can cause significant weight loss, as well as cellular damage.

14. As ordered by Dr. Enaw, on or about January 10, 2005, Mr. Audette began HCV combination therapy, including administration of drug Ribavirin. At the same time, Mr. Audette continued to receive the antiretroviral drug ddI as part of his anti-HIV cocktail.

15. At the time Mr. Audette began receiving HCV combination therapy, he weighed 160 pounds. By February 14, 2005, Mr. Audette had lost approximately ten pounds, and he became concerned that his weight loss may be symptomatic of the onset of AIDS Wasting Syndrome. Mr. Audette also feared that his weight loss would interfere with his ability to fight off infections.

16. In February 2005, Mr. Audette requested that his weight loss be addressed by UMass Correctional Health staff. He noted that he had reported to the SBCC in February 2004 weighing 178 pounds.

17. After orthopedic surgery in August 2004, Mr. Audette's weight dropped, and by October 2004 he weighed 164 pounds. His weight loss appeared to have stabilized around 160 pounds in January 2005, but after beginning HCV combination therapy, Mr. Audette's weight again began to drop.

18. Mr. Audette continued to express concern about his weight loss between February and March 2005, and became increasingly concerned that he was suffering the onset of AIDS Wasting Syndrome, a condition characterized by dramatic weight loss. Throughout this period, Mr. Audette suffered severe emotional distress related to his poor medical condition.

19. By March 28, 2005, a registered nurse at the SBCC noted that Mr. Audette's weight had dropped from 160 pounds in January 2005 to only 142 pounds in late March 2005. Mr. Audette was given extra snacks and a dietary supplement in an unsuccessful effort to stabilize his weight loss, but UMass Correctional Health medical staff undertook no efforts to determine why Mr. Audette was experiencing such a precipitous weight decline.

20. On or about April 16, 2005, Mr. Audette reported that he was losing vision in his right eye. He was not seen by a member of the UMass Correctional health staff until two days later, on April 18, 2005.

21. On April 18, 2005, Mr. Audette was seen by a registered nurse at the SBCC. The nurse reported Mr. Audette's complaint to a medical doctor, who stated that Mr. Audette's condition was a medical emergency.

22.     The medical doctor immediately suspended Mr. Audette's HCV combination therapy, and directed that Mr. Audette be referred to the on-call doctor. The on-call doctor confirmed that Mr. Audette should not receive any further HCV combination therapy, and suggested that Mr. Audette be scheduled for an appointment to see a doctor the following day.

23.     On April 19, 2005, UMass Correctional Health referred Mr. Audette to the Lemuel Shattuck Hospital in Boston, where he was examined by a member of staff in the eye clinic. The member of staff told Mr. Audette that he could have a detached retina caused by HCV combination therapy.

24.     On April 21, 2005, UMass Correctional Health referred Mr. Audette to the New England Medical Center, where his eye condition was again examined. An examination by Rubin W. Kim, M.D. ("Dr. Kim"), a member of the New England Medical Center staff, indicated that Mr. Audette had suffered a detached retina in his right eye, and showed symptoms of recent damage to his left eye as well. Dr. Kim also concurred with the decision to suspend HCV combination therapy.

25.     On May 16, 2005, Howard Libman, M.D., a doctor retained by Mr. Audette's court-appointed counsel to assess Mr. Audette's medical condition, noted in a report submitted to the Court that the antiretroviral drug ddI and the anti-HCV drug Ribavirin should not be coadministered because of the increased risk of, among other things, severe lactic acidosis.

26.     Dr. Enaw did not order, and UMass Correctional Health staff did not monitor, Mr. Audette's lactic acid levels, while co-administering ddI and Ribavirin to Mr. Audette between January 2005 and April 2005.

27.     Dr. Enaw did not order, and UMass Correctional Health staff did not monitor, Mr. Audette for clinical indications associated with lactic acidosis.

28.     The lactic acid level of Mr. Audette's blood sample on May 11, 2005 – almost one month after suspension of co-administration of ddI and Ribavirin – was 4.4 mmol/L. The lactic acid of Mr. Audette's blood sample on May 20, 2005 was 3.0 mmol/L. A normal level is

approximately less than 2.1 mmol/L, according to standards used by the Lemuel Shattuck Hospital laboratory.

29. Mr. Audette gained ten pounds within a short time after UMass Correctional Health personnel suspended co-administration of HCV combination therapy with the anti-HIV cocktail. Mr. Audette's anti-HIV cocktail has since been altered to eliminate the antiretroviral drug ddI.

30. The co-administration of ddI and Ribavirin to Mr. Audette between January 2005 and April 2005 induced severe lactic acidosis in Mr. Audette and caused him significant physical harm, including dramatic weight loss, a known side effect of lactic acidosis, as well as emotional distress.

### *Deliberate indifference to pain management issues*

31. In March 2005, Mr. Audette reported that the pain medication he was receiving, methadose, a narcotic drug, was not effective in alleviating the pain he suffered from neuropathy. He shared articles he had read with UMass Correctional Health medical staff that indicated that the effect of methadose may be reduced when co-administered with Sustiva, as well as articles that suggested that methadose may reduce the efficacy of ddI.

32. On March 31, 2005, Mr. Audette was informed by a UMass Correctional Health staff physician that he was being taken off of methadose. The staff physician ordered that Mr. Audette be tapered off methadose over a two-week period to minimize the effect of withdrawal from a narcotic drug and prescribed Voltaren, an anti-inflammatory drug, for pain. She informed Mr. Audette that after two weeks, he would be taken off of all pain medication.

33. On April 12, 2005, Mr. Audette saw the staff physician once again. Mr. Audette reported that the Voltaren made him nauseous, and told the staff physician that he thought the end of his life was approaching because of his dramatic weight loss and his general feeling of poor health. The staff physician acknowledged Mr. Audette's complaints, and told Mr. Audette that she would discontinue the Voltaren immediately.

34. Mr. Audette's pain management therapy were referred to UMass Correctional Health's so-called "Pain Management Committee" at SBCC for consideration at the next meeting, scheduled for late April 2005. The Pain Management Committee is primarily composed of the employees of UMass Correctional Health, and at all times, the Pain Management Committee was acting within the scope of its employment.

35. The Pain Management Committee was supposed to consider Mr. Audette's condition and recommend a new pain management therapy for Mr. Audette. The Pain Management Committee met on April 27, 2005. Although Mr. Audette's case was scheduled for discussion, the Pain Management Committee did not discuss it because a pharmacist had not prepared the case, allegedly due to technical difficulties.

36. Despite their awareness that Mr. Audette suffered painful neuropathy, and despite their awareness that Mr. Audette was not receiving adequate pain management therapy, UMass Correctional Health's Pain Management Committee decided they would discuss Mr. Audette's case at the next Pain Management Committee meeting. No change was made to Mr. Audette's pain management therapy.

37. The next Pain Management Committee meeting did not occur until May 26, 2005. Between approximately April 27, 2005 and at least May 26, 2005, UMass Correctional Health's Pain Management Committee made no efforts to identify an alternative pain management therapy for Mr. Audette. It was not until after the May 26, 2005 Pain Management Committee meeting that any efforts were made to address Mr. Audette's serious pain issues.

## COUNT I
**(Deliberate Indifference and Civil Conspiracy in Violation of Federal Constitutional Rights – Against Defendant UMass Correctional Health)**

38. Mr. Audette incorporates each of the allegations of foregoing paragraphs as if fully set forth herein.

39. The actions and inactions of UMass Correctional Health, through its Pain Management Committee, demonstrate deliberate indifference to the serious pain management

therapy needs of Mr. Audette, and constitute cruel or unusual punishment that unlawfully deprives Mr. Audette of the rights guaranteed to him by the Eighth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

40. UMass Correctional Health acted and failed to act jointly and in concert with others, constituting civil conspiracy to violate rights, privileges, and immunities secured to Mr. Audette by the First, Eighth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

41. As alleged above, Mr. Audette has suffered injuries as a result of the acts and failures to act by UMass Correctional Health, for which Mr. Audette seeks prospective injunctive relief against UMass Correctional Health.

## COUNT II
### (Negligence – Against UMass Correctional Health, Enaw and New England Medical Center Hospitals, Inc.)

42. Mr. Audette incorporates each of the allegations of foregoing paragraphs as if fully set forth herein.

43. As providers of medical care at SBCC, UMass Correctional Health, Dr. Enaw, and New England Medical Center Hospitals, Inc. had a duty to provide and coordinate adequate medical care to Mr. Audette, an inmate under their care.

44. As alleged above, UMass Correctional Health, Dr. Enaw, and New England Medical Center Hospitals, Inc. breached their duty of care to Mr. Audette.

45. As a direct and proximate result of the negligence of the Defendants, Mr. Audette suffered serious physical harm and emotional distress.

46. On December 7, 2005, by way of certified mail (return receipt requested), Mr. Audette presented his claims, pursuant to Mass. Gen. Laws c. 258 §§ 1, 2, and 4, to Secretary Edward A. Flynn, Executive Office of Public Safety, and to Attorney General Thomas Reilly. To this date, Mr. Audette has received no substantive response to his presentment of claims.

## COUNT III
### (Negligent Infliction of Emotional Distress – Against UMass Correctional Health, Enaw, and New England Medical Center Hospitals, Inc.)

47.　Mr. Audette incorporates each of the allegations of foregoing paragraphs as if fully set forth herein.

48.　As alleged above, the conduct of UMass Correctional Health, Dr. Enaw, and New England Medical Center Hospitals, Inc. was negligent and was the direct and proximate cause of severe emotional distress suffered by Mr. Audette.

49.　UMass Correctional Health, Dr. Enaw, and New England Medical Center Hospitals, Inc. knew or should have known that their conduct would have caused Mr. Audette emotional distress, which has resulted in physical harm to him.

50.　In view of the conduct of UMass Correctional Health, Dr. Enaw, and New England Medical Center Hospitals, Inc., as alleged above, a reasonable person would have suffered emotional distress under such circumstances.

51.　As a direct and proximate result of the negligent conduct of UMass Correctional Health, Dr. Enaw, and New England Medical Center Hospitals, Inc., Mr. Audette suffered severe emotional distress, mental suffering, physical harm, and damages, in an amount to be proven at trial.

52.　On December 7, 2005, by way of certified mail (return receipt requested), Mr. Audette presented his claims, pursuant to Mass. Gen. Laws ch. 258 §§ 1, 2, and 4, to Secretary Edward A. Flynn, Executive Office of Public Safety and to Attorney General Thomas Reilly.  To this date, Mr. Audette has received no substantive response to his presentment of claims.

## REQUEST FOR RELIEF

Wherefore, the Plaintiff respectfully requests that this Court:

a) Issue a permanent injunction enjoining the Defendants from further violations of the Plaintiff's civil rights;

b) Issue an order requiring that UMass Correctional Health ensure that the Plaintiff receives adequate medical treatment for HIV, HCV, and pain management;

c) Award Plaintiff compensatory damages for physical and emotional injury and for violation of Plaintiff's rights;

d) Award Plaintiff punitive damages from each and every Defendant;

e) Award Plaintiff reasonable costs and attorneys' fees; and

f) Grant Plaintiff all other relief as this Court may deem just and equitable.

Respectfully submitted,

**LLOYD F. AUDETTE,**

By his attorneys,

*/s/ T. Peter R. Pound*
Donald J. Savery, BBO #564975
Rheba Rutkowski, BBO #632799
Brandon L. Bigelow, BBO #651143
T. Peter R. Pound, BBO #657378
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
(617) 951-8000

Dated:  April 20, 2007

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon counsel of record for each other party via the CM/ECF system on April 20, 2007.

*/s/ T. Peter R. Pound*
T. Peter R. Pound